(No. 56123.—

*In re* ARNOLD HERMAN CRANE, Attorney Respondent.

*Opinion filed April 13, 1983.—Rehearing denied May 27, 1983.*

David Beckerman, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Sidney Z. Karasik, of Chicago (Catherine L. Grahn, of counsel), for respondent.

JUSTICE CLARK delivered the opinion of the court:

In this disciplinary proceeding the Hearing Board of the Attorney Registration and Disciplinary Commission recommended that respondent, Arnold Herman Crane, be disbarred. The majority of the Review Board of the Commission concurred in the finding of the Hearing Board that respondent had obtained additional fees from the complainants which they believed constituted over-reaching and a violation of respondent's fiduciary duty. However, a six-member majority of the Review Board recommended that the respondent be suspended from the practice of law for a period of one year, expressing the opinion that disbarment would be too harsh. Two members of the Review Board recommended, as the Hearing Board did, that the respondent be disbarred. The Administrator of the Commission filed a motion for reconsideration by the Review Board of its recommendation that the respondent be suspended for one year. The respondent filed objections to the Administrator's motion for reconsideration, stating that while he still denies that he is guilty of any wrongdoing, he is willing to accept the discipline of a one-year suspension as recommended

by the Review Board. The Administrator's motion was denied by the Review Board, and he was granted leave to file exceptions with this court.

Two main issues are raised on appeal before this court: (1) whether the hearing and review boards erred in finding that the respondent's acts constituted over-reaching and a breach of the fiduciary duty owed to his clients, and (2) whether disbarment, the Hearing Board's recommendation, is an appropriate sanction under the circumstances of this case or whether a one-year suspension is a sufficient sanction since the respondent did not file counter exceptions to the recommendation of the Review Board.

Since the facts in this case are extremely involved, an attempt will be made to reiterate only the most important facts. On May 25, 1979, the Administrator filed a complaint against the respondent, charging him with improperly receiving funds from Eva (Smithson) Kryfka, Patricia Smithson, William Smithson and David Smithson, the complainants, who at the time of their mother's death were 18, 15, 14 and 12 years old respectively. On October 4, 1979, the Administrator filed a second amended complaint charging that, in addition to the incidents that were already alleged in the first complaint, respondent had also received another additional fee from Eva (Smithson) Kryfka, William Smithson and David Smithson.

Early in November of 1972, decedent, Jane Bowman, the mother of Eva (Smithson) Krfyka and Patricia, William and David Smithson, was involved in an automobile accident. At the time of the accident Jane Bowman was driving and her daughter Patricia was a passenger. Patricia was "merely shaken up" by the accident, but the decedent injured both her knees. After the accident, decedent and Patricia went to respondent's office and decedent retained respondent as their attorney. Respond-

ent alleges that decedent signed a one-third contingent-fee agreement on behalf of herself and her daughter on that day. This fee agreement was not in the record. During the meeting at the respondent's office, respondent advised decedent's immediate admission to a hospital because of the severity of the injury to her legs.

On November 20, 1972, Jane Bowman died, having never left the hospital. The hospital phoned respondent's office to inform him of her death. On that day, an associate of Mr. Crane contacted the family to inform them of their mother's death and requested that they contact the respondent the following day. On November 21, 1972, Eva (Smithson) Kryfka and Patricia, William and David Smithson went to the respondent's office. The complainants alleged that respondent told them that since their mother had retained him as her attorney, and she was now dead, he was their attorney. Crane alleges that Eva, the oldest of the children, was aware that she herself had not yet retained him and that she was free to choose whatever attorney she wished.

Eva brought several papers with her to this meeting with Crane. The insurance papers included an accidental death policy from Insurance Company of North America (INA), payable in the sum of $100,000, with all the children named as beneficiaries, and a $15,000 life insurance policy from Equitable Insurance Company in which Eva was the named beneficiary. Crane and the complainants discussed various legal matters which had to be handled. Respondent prepared, and Eva Kryfka executed, on behalf of herself and her sister and two brothers, a contingent-fee agreement. The fee agreement was for two actions Crane was to bring on the children's behalf, an action against INA on the accidental death policy, and a claim for wrongful death against Dickson and Car Carriers (Dickson), the owner of the truck involved in the accident with Mrs. Bowman. The fee agreement provided

for 25% of the proceeds if the actions were settled without a lawsuit and one-third if a lawsuit had to be filed.

At that same meeting, Crane explained the need for an autopsy to establish a causal connection, if any, between Mrs. Bowman's death and the accident. Respondent sought an autopsy on the decedent, suspecting that an embolism from the leg injury may have caused her death, and that INA would then be liable on its policy of accidental death insurance and Dickson would be liable for Jane Bowman's death, not merely for personal injuries. Eva gave permission for the autopsy, which was subsequently performed. Respondent also discussed the necessity of opening an administrator's estate with the complainants at that meeting.

In February of 1973, allegedly after numerous attempts to negotiate a settlement, Crane filed an action in the circuit court of Cook County against INA entitled Eva Kryfka *et al.,* v. Life Insurance Company of North America No. 73 L. 1548. In March, again allegedly after unsuccessful settlement negotiations, Crane filed a second lawsuit entitled Eva Kryfka *et al.,* v. Kenneth Dickson and Car Carriers, Inc., No. 73 L 4622, seeking recovery for the wrongful death of Jane Bowman. Respondent also opened an administrator's estate on behalf of Jane Bowman, and opened a minor's estate for each of the children, appointing Eva, who had just reached her majority, as the guardian for each minor.

Both lawsuits that were filed were settled. Respondent settled the life insurance claim against INA for $100,000, the full amount of the policy. The settlement was approved by the probate division and respondent was awarded 25% of each minor's share as his fee. Four checks were issued by the insurance company, each in the amount of $25,000. Eva, as guardian, endorsed the three minors' checks. After deducting $6,427 from each minor's share for his fee and expenses, the respondent

issued checks to Patricia, William and David for $18,573 each.

On September 25, 1973, Eva accompanied respondent to court in order to gain final approval from the probate division, and then Eva and respondent went to the American National Bank. At the bank, respondent opened a minor's account for each of the children, pursuant to order and subject to the supervision of the court. The appropriate check was deposited in each child's account. Eva's share was handled differently than the minor children's shares. The distribution of Eva's share will be discussed later.

In December 1974, respondent also settled the wrongful death action against Dickson for $75,000. Respondent received approval from the probate division for the settlement and his 25% fee. One check for $75,000 was issued, properly endorsed, and deposited by respondent. After respondent deducted his fee ($18,750) and the expenses he was allowed by the court, respondent issued a check to each of the four children in the amount of $13,646.77, which represented the proceeds owed to each child.

On January 24, 1975, Eva and Patricia went to respondent's office for their checks. Crane met them at his office, and then all three went to the American National Bank. Respondent deposited the full amount of William's and David's checks into their respective trust accounts. However, the distribution of Eva's and Patricia's share (Patricia having just reached majority) was handled differently and will be discussed later.

Since each child's dealings with Crane differed, the facts relating to each child will be discussed separately. However, before we get into a detailed discussion of those facts, it is important to note that another lawsuit was filed by respondent relating to Mrs. Bowman's death. In the course of taking depositions in the Dickson

case, the possibility of a medical malpractice action on behalf of decedent's estate against the hospital and/or Dr. Doktorsky, Mrs. Bowman's treating physician, was allegedly suggested to Crane by defense attorneys. Respondent claims that he told the children it would be difficult to prove the cause of death in order to recover for medical malpractice and while he would be willing to handle the case, he would not do so on a contingent-fee basis. Respondent alleges that Eva insisted that the suit be brought on behalf of the minors, and that she agreed to pay for whatever legal work was done. Eva denied that she had any discussions with Crane regarding the fees in the medical malpractice action. She testified that she thought the malpractice case was going to be handled on a contingent-fee basis. The fact remains that no fee agreement was entered into concerning this medical malpractice suit, so that even if Eva understood, as Crane alleges, that this case was to be handled on a non-contingent-fee basis, she did not know what Crane was going to charge her per hour, no bills were sent, and no receipts were ever issued. Crane does not deny that no fee agreement was entered into regarding the medical malpractice lawsuit. The importance of these facts will become apparent later.

We will discuss Eva's financial dealings with Crane first. Eva's share of the INA insurance settlement, prior to deducting fees and costs, was $25,000. Since Eva was an adult, distribution was made directly to her without court approval. On September 25, 1973, respondent instructed Eva to endorse her check for $25,000 to him. He then issued a check to her in the amount of $15,000, keeping $10,000 as his fee. No receipt was issued at that time. Respondent next filled out a deposit slip for $12,500 for Eva. After depositing the $12,500, Eva received $2,500 in cash. What happened to the $2,500 in cash is in dispute. Eva alleges that respondent received

the $2,500 in 25 $100 bills, which he kept, stating that the money represented "additional fees." Eva alleges that respondent neither indicated what the fees were for nor issued a statement or receipt when he allegedly received a total of $12,500 on that date. Crane denies that he received any additional money from Eva that day. The opening deposit that Eva made at the American National Bank that day was $12,500.

Eva's share of the wrongful death claim, less the fees and costs ordered by the probate court, was $13,646.77. On January 25, 1975, after the court appearance regarding the wrongful death settlement, respondent allegedly took Eva and Patricia to the American National Bank. Eva testified that, after she endorsed her check, the respondent instructed her to make out a deposit slip for $10,000. Eva alleges that respondent received the remaining $3,646.77. Eva also stated that on that same day Crane demanded and received an additional $750 in cash from her and Patricia. Eva alleged that she withdrew $1,500 and gave respondent $750 for her and $750 for Patricia.

Crane testified that his partner Shapiro handled the distribution of the wrongful death settlement in January of 1975. Crane contends that Eva and Patricia paid additional fees to Mr. Shapiro by certified check, each check in the amount of $3,646.77. But Crane denied that he was at the bank on the date in question and also denied that he requested or received $750 from either Eva or Patricia. Crane testified that the distribution was handled without his knowledge by his partner and that he first became aware of the certified-check payments following a meeting in 1978 with Eva and the Smithsons, the new family attorney, and Mr. Braun, counsel for respondent. Respondent does not dispute that the money was deposited by Shapiro into their partnership account and that he, therefore, received the benefit of the money.

However, he does contend that he had no knowledge of Shapiro accepting the money and, therefore, should not be held accountable.

Eva's share of the two settlements was $38,646.77. Eva alleges that respondent received $16,146.77. The Administrator's brief claims that respondent received $22,334.72 from that total.

Patricia Smithson attained her majority in October of 1974, after the first settlement with INA, but before the second settlement with Dickson. Allegedly at respondent's request, Patricia and Eva went to respondent's office on October 9, 1974. Mr. Shapiro, Crane's associate, handled matters that day. Patricia testified that Shapiro instructed her that they were going to court and that she should not mention to the probate judge the additional fees that he, Shapiro, had requested. At the courthouse, when the judge asked if there were additional fees owing, Patricia testified that Shapiro said no. After appearing in court, Shapiro, Eva and Patricia went to the American National Bank. Patricia testified that Shapiro demanded and received $3,200 in "additional fees" on that date.

As was discussed earlier, Patricia, Eva and Crane allegedly went to the bank in January of 1975, after the settlement of the wrongful death action. At one point in this case, Patricia had alleged that she had not received her share of the wrongful death settlement, but a cashier's receipt for $10,000 was produced and she recalled depositing that money. Patricia testified that respondent instructed her, as he had instructed Eva, to endorse her check for $13,646.77. After endorsing the check Patricia informed respondent that she had recently closed her account at the American National Bank and put her money in another bank. Respondent allegedly used her settlement check to purchase a $10,000 cashier's check payable to Patricia and had the bank issue a cashier's check

for the remaining $3,646.77 payable to his firm. As discussed previously, Eva testified that Crane also demanded and received $750 each from her and Patricia. Eva testified that a $1,500 cash payment was made to Crane because he stated that the amount was for fees still owed him.

Patricia's share of the two settlements was $32,219.77. The probate division approved fees owing to respondent in the amount of $11,114.50. Patricia alleges that respondent obtained $17,961.27 from her, $6,846.77 more than the fee approved by the court.

William Smithson reached the age of 18 years on November 28, 1975. Crane testified that Eva advised him earlier in the month of November that William was about to reach his majority and that he wanted his money. William testified that at the time he was unemployed. He further testified that he went to respondent's office on December 16, 1975, and signed documents which Crane held in his hand and that, when he asked to read the documents that he was signing, respondent stated that he was in a hurry and that William should just sign them. Crane testified that William called him and told him that he was employed at a garage and that he wanted his money, but wondered whether the matter could be handled without his (William's) presence. Crane testified that he advised William that William's presence was unnecessary if he would sign an affidavit. The affidavit, Crane claims, was delivered by an associate of his to the Kryfka residence. Crane's associate testified that he did deliver papers to the Kryfka home for signature.

One of the documents signed by William was an affidavit stating that he was employed and that it would be inconvenient for him to appear in court. William testified that respondent told him that it would not be wise for him to go to court with respondent, that he might "say the wrong thing and mess it up" so that he would not

get his money until he was 21 years old.

On December 29, 1975, William returned to respondent's office. Respondent gave William a copy of the probate division order and a bank passbook. Crane testified that he told Eva that the family owed him fees for work that he had done to date on the malpractice case. Eva allegedly told Crane that he should take the money from William and that the family members would apportion the cost among themselves. William testified that when respondent gave him the passbook he told him they had to go to the bank because William owed him money. William testified that he asked respondent what the money was for and that respondent stated that it was for keeping the account open and gathering interest for the years between the time when Patricia had turned 18 and William had turned 18. Respondent prepared a withdrawal slip, William testified, in the amount of $4,800 and instructed William to sign it. William testified that respondent gave the slip to the teller and received $4,800 in large bills, which Crane kept. Crane's story differs from William's in that Crane testified that he did not go to the bank with William that day but that William showed up in his office the first week in January of 1976 and gave him $5,000 or $5,200. William testified that he did go back to respondent's office in January with $2,000 in addition to the $4,800 Crane had taken from him at the bank. William stated that Crane had contacted him and told him that he had "shortchanged himself" and that William still owed him an additional $2,000. In any event, William gave Crane money in January which allegedly was for additional attorney fees without receiving a bill or receipt.

Crane testified that he had successfully handled a hit-and-run case for William in March—a case where William was a defendant. Crane requested a $1,500 retainer for that service. Crane stated that William gave him

$1,200 in cash at the time of his representation in March of 1976 and that he called William the next day to tell William that he had shortchanged himself. On cross-examination, William stated that he did give Crane additional money in March of 1976. The record is unclear as to whether the occurrence in January and the occurrence in March were actually one and the same.

William's share of the two settlements was $32,219.77. The probate division approved fees owing to respondent in the amount of $11,114.50. William alleged that respondent obtained $17,914.50 from him, an amount constituting $6,800 more than the fee approved by the court.

David Smithson, the youngest of Jane Bowman's children, became 18 on February 1, 1977. Respondent allegedly called David Smithson early in 1977 and told him he should call respondent when he became 18. Crane testified that in December of 1976, after the malpractice suit was dismissed on a motion for summary judgment, Eva advised him that David was reaching his majority soon and he wanted his money. According to Crane she told him that the family would settle up all the remaining fees they owed him when David got his money.

In January of 1977 before David turned 18, David testified that he asked Eva if she knew of another lawyer. Eva purportedly told him he should call a particular lawyer whom she named. David called him and asked him to review some documents relating to the case. David met him at his office and they reviewed the documents. They also met at the Chicago Civic Center and reviewed the court files. The attorney then met with all the members of the family and advised them to complain to the Attorney Registration and Disciplinary Commission concerning the handling of their affairs.

On February 24, 1977, all four of the complainants went to the offices of the Commission, where they filled

out and submitted a complaint form. At that time the complainants told the Commission that David had an appointment with respondent the next afternoon. The family again met with members of the Commission the morning of February 25, 1977, after one of the members of the staff called them, but before David was to meet with Crane.

In the afternoon on the 25th, David and Eva went to respondent's office. Crane testified that they arrived late and he told them because they were tardy he was not sure he could get a court order approving distribution that day. David testified that Crane told him that he was unsure if he would be able to get his money because David had waited too long and the laws were changing. Respondent and Eva talked privately on that day. Respondent testified that he talked to Eva about the non-contingent fees still owed for the medical malpractice suit. According to Crane, Eva told him to take the money from David's account and that the members of the family would settle up among themselves. Eva's version of the conversation differed substantially. She testified that Crane took her aside to ask her if David was going to make trouble for him over the money David owed him.

Eva, David and Crane went to probate court after their meeting at Crane's office. David testified that respondent told him to "keep his mouth shut and go along with anything." David stated that at the courthouse Crane told him not to mention anything about fees, because if he did he might not get his money until he was 21. Crane denied that he advised David to lie. An order releasing David's funds was obtained that day.

On the way from the courthouse to the bank, Eva testified that respondent took her aside and told her that he was going to take about a third of the money in David's account and that if she did what she was told to

do, there might be a little something in it for her. At the bank, respondent allegedly told David to fill out a withdrawal slip for $12,000. Crane took the slip to James Brenner, a bank official. Brenner told the respondent that any amount over $10,000 required special approval. After hearing that special approval was required, a new slip for $9,500 was filled out. Brenner, David and Crane went to a vault and Brenner handed Crane 95 $100 bills. David testified that he asked Crane for a receipt and that respondent told him he was not going to give him a receipt to avoid taxes from having to be paid on the money. David agreed to bring respondent the remaining $2,500 he was supposed to owe him the following week. David testified that respondent told him that when he paid the rest of the money he would receive his bank book.

David's share of the two settlements was $32,219.77. The probate court set respondent's fee at $11,114.50. Respondent allegedly received $20,614.50 from David, $9,500 more than the fee approved by the court.

While respondent was still at the bank with Eva and David, he was served with a subpoena by one of the investigators of the Commission. The subpoena required that Crane produce all the documents and records that he had pertaining to the complaint that had been filed by Eva Kryfka and the Smithsons. Later in this opinion there will be a discussion of the role of the Commission in the occurrences of February 25, 1977.

Respondent testified that he did charge Eva and the Smithson children fees relative to the medical malpractice action he brought in their behalf. He testified that he spent substantial time (175 hours) on that matter and that Eva knew that his fees were to be paid on a noncontingent-fee basis. Eva testified that there were no discussions relative to fees, no retainer was paid, and no written fee agreement was entered into. Respondent

does not deny that he sent no bills, kept no time records, and issued no receipts. However, he does assert that Eva knew that he had additional fees owed to him for not only the medical malpractice action but also other matters he handled for the family on a regular basis. Crane alleges that the children came to him on numerous occasions with problems they were having and that he would always talk with them and try to help them out. He alleges that he met with various family members concerning David's truancy, Eva's difficulties in getting Patricia to go to school and work, and Eva's marital difficulties and fear that her husband was going to take her money. Eva also consulted the respondent regarding a possible lawsuit regarding the death of one of her children. After investigating the matter, respondent advised Eva that there was no cause of action.

According to the Administrator, since the institution of the disciplinary proceedings in this case, respondent has returned the sum of $24,088.06 to Eva Kryfka and the Smithsons. In the Administrator's brief, it states that Eva has received $3,646.77, Patricia has received $6,852.56, William has received $4,088.73, and David has received $9,500.

Mr. Crane was 49 years of age at the time the complaint against him was filed. He was admitted to the practice of law in Illinois in 1955. He had several character witnesses testify on his behalf to the effect that he has an excellent reputation in the community for truth and veracity.

In this case, both the Hearing Board and the Review Board concurred in the finding that "respondent had committed a number of improprieties as alleged against him in the complaint." Those improprieties, they found, consisted of "obtaining additional fees from complainants," "individuals that lacked a good deal of sophistication in the affairs of life." The additional fees that were

given to Crane were always paid in cash, and in all cases without submission of written bills or any explanation of the basis of the billing.

The hearing and review boards found that these additional fees received by the respondent constituted "overreaching and a violation of respondent's fiduciary responsibility" to the complainants. They also found that respondent's actions brought the legal profession into disrepute.

This case is unusual in that it involves complainants who were minors, with the exception of Eva, the eldest, when they first came in contact with the respondent. It is clear from the record that the complainants, without the guidance of either parent, placed an extraordinary degree of trust and confidence in the respondent. While we have always recognized that an attorney occupies a fiduciary relationship to his client (see *In re Czachorski* (1969), 41 Ill. 2d 549), in certain circumstances a closer relationship develops between some attorneys and their clients. As this court stated in *In re Saladino* (1978), 71 Ill. 2d 263, 272-73:

> "We do not wish to discourage attorneys from developing close relationships with or from undertaking more responsibility on behalf of clients. Given the position of attorneys in our society, it is not surprising that frequently they become indispensable to their clients. Their advisory role may come to transcend merely the dispensation of legal counsel. Having undertaken such responsibility, however, an attorney is under a duty not to abuse such a relationship and an obligation to avoid even the appearance of impropriety."

We concur in the Hearing Board's finding that "the relationship between Arnold Crane and these complainants [was] one that was not merely of the ordinary attorney-client relationship but one which was vested with an additional high degree of trust and confidence."

Given the special relationship that developed between

the respondent and his clients in this case, we find that the respondent, having undertaken such responsibility, was under a duty not to abuse his relationship to the complainants and to avoid even the appearance of impropriety. Requesting and receiving large sums of cash from each minor upon reaching majority, without ever explaining the basis of these "additional fees" and without ever issuing receipts, certainly gives rise to the appearance of improper conduct. Respondent knew these clients were young and lacked sophistication in the handling of financial and legal matters. Therefore, he should have taken every step to keep them informed of the matters he was handling for them and handled them in an above-board manner.

Respondent asserts that complainants were "completely discredited by their blatantly contradictory testimony" at the hearing. While there are places in the record where the testimony is not always clear, perhaps due to the lapse of time and the ages of the children at the time some of the incidents occurred, the Hearing Board and Review Board believed the complainants' testimony or they would not have recommended that the respondent be disciplined. We too, after reviewing the record in this case, conclude that the respondent's conduct warrants discipline.

The Administrator alleges that respondent intentionally deceived the probate court. The Administrator asserts that the respondent was required to obtain court approval for the fees he was charging in the medical malpractice case. The Administrator, in support of his contention that approval was necessary, refers to Rule 12.23 of the rules of the circuit court of Cook County, which was in effect in 1977 when the malpractice claim was pending. Rule 12.23 required that any *settlement* of a personal injury cause of action on behalf of an estate had to be approved by the probate division of the circuit court. Respondent had an expert witness testify that respondent did not violate any custom, rule or practice in the probate division in not get-

ting approval for the additional fees he received for the medical malpractice action.

We do not agree with the Administrator that Rule 12.23 supports the allegation that respondent was required to obtain approval of the court to collect the additional fees in question. There was no settlement in the malpractice action; the case was dismissed. Thus under Rule 12.23 the respondent was not required to obtain court approval.

The Administrator cites two cases for the proposition that the probate division has the power to fix reasonable attorney fees and the discretion to disallow or disapprove such fees in certain circumstances. (*In re Estate of Minsky* (1978), 59 Ill. App. 3d 974; *In re Estate of Brown* (1978), 58 Ill. App. 3d 697.) In both those cases the fees that were contested were fees for the normal duties of administering an estate of a deceased. Respondent claims that the fees he was collecting from the complainants were for a medical malpractice suit which was outside the regular duties performed in administering the estate of the decedent and that Eva, who was over 18, understood that the fees for the malpractice claim were to be handled on a non-contingent-fee basis.

The Administrator cites no authority, and we have found none, that states that it was mandatory that Crane obtain approval of the probate court for the fees he charged for the malpractice claim. It seems incredible that there is no rule requiring court approval for attorney fees for the medical malpractice claim in this case because it was dismissed and not settled, but it is clear that no such rule exists. The Hearing Board found that respondent received additional monies from the complainants totaling $18,666. Crane admits that he demanded a total of approximately $17,000 for his services in the malpractice case. The fee, he testified, was predicated on 175 hours he spent on the malpractice claim. Crane asserts that the Administrator did not cross-examine him regarding the time spent

on the malpractice case or the quality of services rendered. Crane contends that he had the money coming to him for the services he rendered over and above the work he did on the INA and Dickson cases and that he did not need court approval for these fees. Crane asserts that his only indiscretion was in failing to enter into a written fee agreement regarding these fees.

The Review Board stated, "If additional services were rendered, we conclude that respondent was entitled to be paid for those services. Our point of departure from counsel for respondent's line of argument is respondent's overreaching manner in collecting the additional fees." The Hearing Board stated, "What is incredible about the relationship is that the respondent was retained to handle a malpractice case on an open ended fee arrangement without either a fee agreement or the manner in which fees were to be charged ever being discussed between the parties." While we recognize that it is not mandatory that an attorney enter into a written non-contingent-fee agreement with a client, we believe that a prudent attorney, given the relationship Crane had with these complainants, would have at least discussed the manner in which the fees were to be charged. The respondent's conduct in receiving the fees without bills or receipts and his alleged comment regarding his desire to avoid paying taxes on the $9,500 he received from David certainly raises suspicion as to the propriety of his actions.

There was also a charge made by the Administrator that Crane told the minors not to tell the judge in probate court that there were additional attorney fees owing when they appeared in court. There is nothing in the record to suggest that it is regular practice for the judge in probate court to ask about attorney fees when a minor's estate is being closed. Crane denies that this charge has any validity and argues that the record does not support the Administrator's claim. The Review Board found that "he [respond-

ent] requested the minors not to tell the judge that there would be any more fees paid." It is clear that the hearing and review boards believed the testimony of the complainants on this disputed question of fact.

Prior to this case being argued before us, the respondent filed a motion to supplement the record on appeal by the inclusion of discovery depositions taken of John O'Malley, William Stephenson, Kevin Roach and Howard Kaufman, members of the Commission's staff. This court granted the motion and entered an order allowing the record to be supplemented. The Administrator of the Commission subsequently filed a motion requesting that this court reconsider the order which was entered. The court directed counsel for the Administrator and counsel for the respondent to argue the pending motion of the Administrator during oral argument in this cause on Tuesday, September 14, 1982. In the course of oral argument, counsel for respondent asked for leave of court to file written objections to the Administrator's motion. Respondent's counsel was given leave to file his motion, and the Administrator was given leave to file a response to the respondent's motion.

In support of his contention that the order allowing the record on appeal to be supplemented was properly entered, respondent cited *In re Steinbrecher* (1973), 53 Ill. 2d 413. In that case, this court, in referring to certain affidavits and letters written on behalf of the respondent therein, stated,

> "These documents were not presented to the hearing panel, but we do not regard respondent as having been prejudiced by their absence. They were before the Board of Governors in their review of the hearing panel's findings and recommendations which were concurred in by the Board. In any event, final responsibility for determining the severity of the discipline to be imposed rests with this court, and we have examined and considered them." 53 Ill. 2d 413, 420.

The *Steinbrecher* case is distinguishable from the instant case for two reasons. First, in *Steinbrecher* the respondent was not represented by counsel at the hearing. Respondent's counsel had filed a motion for a continuance because he was going to be on trial on the date the hearing was scheduled. The hearing was held even though counsel was not present. Second, the evidence which was at issue in *Steinbrecher* was considered on review, before the case came up to this court on appeal.

In the instant case, respondent was represented by counsel at the hearing. Also, the evidence in question was not newly discovered evidence but a number of discovery depositions which were taken prior to the hearing in this matter and which were available to counsel at the time of the hearing and at the time of review by the Review Board.

While we do not approve of the practice of the respondent in the instant case in requesting that this court consider evidence which was available to him before the hearing but which he failed to present to either the hearing or review boards, we will consider this evidence that has been allowed in and is presently before us as part of the record. As we said in *Steinbrecher*, final responsibility for determining the severity of the discipline in an attorney-disciplinary case rests with this court. Therefore, given the nature of the proceedings before us and the discrepancy of the recommendations with which we are faced, and since an order was previously entered by this court allowing the evidence to be added to the record, we will consider it in deciding this case.

As the Administrator concedes in his response to the respondent's objections to the Administrator's motion to reconsider the order supplementing the record, this court clearly has the authority to supplement the record in its discretion. As this court stated in *In re Mitan* (1979), 75 Ill. 2d 118, 123-24:

"The disciplining of attorneys is in the nature of an original proceeding in which the Attorney Registration and Disciplinary Commission and its various officers, *** serve only as agents of this court in administering the disciplinary functions that have been delegated to them. *** This court has held that because of the nature of the proceedings before those to whom we have delegated the authority to act, we will not consider technical objections as to the practice and procedures before them, nor can such technical objections bind us or limit our authority to act."

The respondent requested that these depositions be made part of the record because he alleges that members of the Commission staff are guilty of prosecutorial misconduct. Evidently the respondent believes that these depositions shed some light on his allegation.

The respondent discusses entrapment in his brief. He alleges that entrapment has been recognized as a viable defense in disciplinary cases and cites *In re Porcelli* (1979), 77 Ill. 2d 473, for that proposition. In that case this court stated,

"It would be difficult to imagine circumstances in which the defense of entrapment would be available to an attorney in a disciplinary proceeding. Attorneys are versed in the law and should be keenly aware of what activities constitute a breach of the law. This knowledge is inconsistent with the central premise of entrapment, *i.e.,* an implantation of criminal intent in the mind of an innocent person. (*Sorrells v. United States* (1932), 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210.) Therefore, in only the rarest of circumstances may an attorney label himself innocent and shield himself with the defense of entrapment." 77 Ill. 2d 473, 478.

The respondent then asserts that he was not entrapped because he did nothing illegal.

Respondent next contends that the "defense of entrapment is not present or necessary, but [that] the attempt by the Administrator's staff in the dubious manner herein suggested, amounts to prosecutorial misconduct." We be-

lieve that the respondent's assertion is without merit. The Commission first became involved in this case when the complainants came to the office of the Commission and filed a complaint on February 24, 1977. The next day, David Smithson had an appointment with the respondent which he had made prior to going to the Commission and filing the complaint. The members of the Commission staff whose depositions were added to the record explained that they asked David Smithson if they could observe what took place during the time David was to meet with the respondent on February 25, 1977.

Crane asked David for $12,000 at the bank. David did not offer to give him $12,000 that day. The staff members just observed what went on. They did not even request that David keep his appointment with respondent on the day in question.

It was Crane's idea to ask for the money. It was also his idea to reduce the amount of the withdrawal slip when it became apparent that a "large bill report" for the Federal Reserve Bank was required for any withdrawal over $10,000. It certainly was also Crane's idea to receive $9,500 in cash and not issue a bill or a receipt for the money. David testified that when he asked respondent for a receipt for the $9,500, respondent allegedly told him that he could not give him a receipt because it was "tax-free money," and that if David received a receipt he (Crane) was "going to have to pay taxes on it." Crane denies that he made this statement.

Neither David Smithson nor the members of the Commission staff in any way precipitated the respondent's conduct on February 25, 1977. There is absolutely no evidence of entrapment or prosecutorial misconduct in the record in this case.

Since we have decided that the respondent's conduct in this case warrants discipline, it is necessary to determine the degree of discipline which is warranted, given the par-

ticular facts in this case. "While a degree of uniformity in the application of attorney discipline is desirable, each case must still be determined on its own merits." *In re Andros* (1976), 64 Ill. 2d 419, 425-26.

"Disbarment of any attorney is the death of his professional life. Regardless of whether the misconduct charged amounts to a crime or merely to professional misconduct, such charge must be proved by clear and convincing testimony." *People v. Lotterman* (1933), 353 Ill. 399, 410.

Disbarment is not warranted in this case. Therefore, we next consider whether the sanction of suspension is warranted and, if it is, to what degree.

The money that was received from the complainants herein was requested and received by the respondent after each had attained majority, and the Administrator did not dispute the fact that the respondent had spent 175 hours working on the medical malpractice case for the complainants.

There are several reasons, however, that we find justify suspension in this case. Because of the unique relationship the respondent had with these complainants, we find that his surreptitious manner in collecting his additional fees was improper. The respondent's requesting large sums of cash without issuing bills or receipts is behavior we certainly wish to discourage. Telling clients not to say anything if asked a question by a judge is also conduct which tends to bring the legal profession into disrepute. The complainants in this case were young impressionable people who probably had not had any prior contact with our judicial system other than their dealings with Mr. Crane. It was his responsibility, as a member of the legal profession and as a person in whom these clients placed a substantial degree of trust and confidence, to handle their matters with the utmost degree of care and honesty. We cannot expect others to respect our system of justice when a member of the legal profession refuses to issue a receipt to a

client, telling that person that his purpose in not issuing the receipt is to avoid paying taxes on the money received.

"The purpose of a disciplinary proceeding is to safeguard the public and maintain the integrity of the legal profession." (*In re Levin* (1979), 77 Ill. 2d 205, 211.) We believe that suspension of the respondent from the practice of law for three years will serve this purpose.

*Respondent suspended.*

JUSTICE UNDERWOOD, dissenting:

Respondent's conduct in this case is, it seems to me, simply indefensible. After securing probate court approval of his fees in connection with the wrongful death action and insurance policy claims, respondent demanded and received from the children substantial additional fees, usually in cash, with no written statements or explanations of the basis for the claims. Not only were these amounts never approved by the probate judge, but respondent also told the minor clients to lie to the judge if he asked them about fees other than those which had been approved. When told by a bank official that payment to him in cash of his final "fee" in the amount of $10,000 would require his name and address to be recorded, respondent reduced the amount of the requested fee. The inference to be drawn is clear, as the Review Board noted.

Such gross abuse of the fiduciary position which respondent occupied is aggravated by the fact that he was dealing with unsophisticated minors. They apparently uncritically acquiesced in his demands until David, the youngest child who was about to reach his majority, suggested seeing another lawyer, and respondent's misconduct came to light.

Suspension is, in my judgment, simply an inadequate sanction for a lawyer who can so readily and completely abandon his professional responsibilities, and who, to conceal his own misconduct, urges his minor clients to lie to the court of which he is an officer. I would disbar. *In re*

*Nadler* (1982), 91 Ill. 2d 326, 334 (Underwood and Moran, JJ., dissenting).

JUSTICE MORAN joins in this dissent.