(No. 57376.—

*In re* BARRY MICHAEL WOLDMAN, Attorney, Respondent.

*Opinion filed October 4, 1983.—Rehearing denied December 2, 1983.*

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Barry M. Woldman, of Chicago, *pro se.*

CHIEF JUSTICE RYAN delivered the opinion of the court:

Two complaints were filed against the respondent, Barry Michael Woldman, by the Attorney Registration and Disciplinary Commission. The first complaint was in five counts, while the second complaint contained one count. The two complaints were consolidated for hearing. A panel of the Hearing Board unanimously recommended that the respondent be disbarred, and the Review Board unanimously approved the panel's report and recommendation.

The first complaint, in counts I and II, alleged misconduct by the respondent in handling the proceeds of a $170,000 personal injury settlement the respondent had negotiated on behalf of Murray Stiles. Respondent disputes the findings as to these counts. Counts III and IV of the first complaint alleged misconduct by the respond-

ent in the handling of the proceeds of a $10,000 personal injury settlement that had been negotiated on behalf of Thomas Rourke. Respondent admits all the allegations of misconduct in these two counts. Count V of the first complaint alleged misconduct in the distribution of a $10,000 settlement of a personal injury claim of Patricia Sapyta. Respondent admits the allegations of the misconduct charged in this count. The second complaint, in its only count, alleged misconduct of the respondent in the distribution of the settlement of a personal injury claim of Jennifer Thompson, a minor. Respondent admits the allegations of misconduct alleged in this complaint. Thus, it is only the two counts involving Murray Stiles that are disputed. Respondent also contends that the sanction of disbarment is excessive and unwarranted, in view of the evidence he presented concerning his character and reputation and the evidence of mitigating circumstances.

Murray Stiles retained the respondent to prosecute a personal injury claim. The respondent negotiated a $170,000 settlement of the claim. Before receiving the settlement draft, respondent and Stiles discussed how Stiles would invest the money.

According to the respondent, they negotiated an agreement evidenced by a promissory note which provided that Stiles would loan the respondent $70,000 to meet his personal and business expenses. According to Stiles, however, the respondent merely told him that he would invest his money at a 10% interest rate, and did not mention a promissory note or a security device. The parties also dispute whether the respondent told Stiles about his financial condition. He had debts of $200,000, had exhausted his line of commercial credit, and had various lawsuits for unpaid debts pending against him, including a mortgage foreclosure on his home. While the

respondent claims that he advised Stiles to seek independent financial and legal advice, this is denied by Stiles, who agreed to the proposition without the benefit of counsel.

On July 31, 1978, the respondent received the settlement draft of $170,000 and deposited it in his client trust account. On August 2, 1978, he issued Stiles three checks in distribution of the settlement. One was for $70,000. Stiles endorsed this check and returned it to him. The respondent testified that he also contemporaneously executed a promissory note, but that his law clerk mistakenly failed to deliver it to Stiles until a later time. Stiles denied this assertion, however, and his denial is corroborated by a letter which the respondent had written to Stiles' new attorney, Val Bylaitis, on September 18, 1978, shortly after the settlement transaction. In this letter the respondent had told Bylaitis that no documents had been executed and no promissory note had been delivered concerning the loan, because he could not locate Stiles.

On August 18, 1978, the respondent deposited the check for $70,000 into an account used for business and personal expenses. On September 11, 1978, Stiles sent the respondent a letter, prepared by Bylaitis, which asked the respondent to make an account of these funds and return them. Two days later Bylaitis telephoned the respondent to repeat these requests. The respondent told Bylaitis he would return $40,000 immediately, but could return the remaining $30,000 only when he was able to liquidate Stiles' investment.

When Bylaitis sent the respondent a letter confirming the telephone conversation, the respondent, as noted previously, sent Bylaitis a reply letter characterizing the transaction as a loan and admitting no documents were executed. On October 4, 1978, the respondent gave

Stiles a check for $40,061.15 and a promissory note for the remaining $30,000. Before returning these funds, however, Woldman had overdrawn his account and used Stiles' funds for business and personal expenses. None of the funds were ever invested for Stiles' benefit as the respondent had promised.

The respondent later defaulted on the note. On February 16, 1979, following the default, Stiles' wife wrote the Attorney Registration and Disciplinary Commission, without the knowledge or consent of her husband, and complained about the respondent's conduct. As a result, the respondent filed a defamation action against Stiles on July 13, 1979, in the circuit court of Cook County. He also drafted a letter to the Commission, which he had Stiles sign, purporting to withdraw the disciplinary complaint.

The letter stated that the transaction was a documented loan and attached an exhibit purporting to be a copy of a note which allegedly was executed on July 31, 1978. This statement was, however, demonstrably false. In his letter to Bylaitis of September 18, 1978, which constitutes a prior written admission as we have noted, the respondent stated that he did not execute a note. Thus, the exhibit was not a copy of the note but a false document created to evidence a note which respondent claimed to have lost.

At a meeting of the parties on July 17, 1979, respondent told Stiles he would repay him $10,000 and drop his defamation action if Stiles would sign the letter asking that the disciplinary proceedings be dropped. Although Stiles knew the letter was false, he signed it to obtain part of the money due him. Before this court, the respondent contends that the factual findings showing he converted Stiles' money and improperly negotiated a release of his defamation suit were contrary to the evi-

dence and the law.

The Hearing Board must evaluate disputed questions of fact, and its findings, when affirmed by the Review Board, are entitled to essentially the same weight as those of any other trier of fact. (*In re Hopper* (1981), 85 Ill. 2d 318, 323; *In re Teichner* (1979), 75 Ill. 2d 88.) Under our Rule 753(c), the Administrator must prove allegations of misconduct by clear and convincing evidence. (87 Ill. 2d R. 753(c).) The credibility of the witnesses is to be determined by those who hear and observe them.

The respondent's credibility was severely shaken by the inconsistent positions he took with regard to the transaction with Stiles. Respondent, in this court, contends that the testimony of Stiles is rendered unworthy of belief because of the inconsistent positions Stiles took concerning the transaction. The hearing panel heard and observed the witnesses and obviously did not believe the respondent's version of what had taken place between him and Stiles. We have been shown no reason why we should not abide by the hearing panel's assessment of the credibility of these two witnesses. Having done so, we must conclude that the findings are supported by clear and convincing evidence. We note that respondent's conduct in the Stiles' case parallels his conduct of mishandling the proceeds of the personal injury settlements of Thomas Rourke and Jennifer Thompson, which we will discuss later. As noted above, respondent, before the hearing panel and in his brief in this court, admits the misconduct alleged as to these two settlements.

The letter which Stiles purportedly wrote to the Commission withdrawing the disciplinary complaint does not exculpate the respondent. Allegations concerning the drafting, execution and mailing of this letter to the Commission, as well as the filing by respondent of a lawsuit against Stiles, and the release executed by the respond-

ent in favor of Stiles contingent upon the withdrawal of the complaint filed with the Commission, are all contained in count II of the first complaint filed with the Commission. It is alleged in this count that these acts constituted conduct involving dishonesty, fraud, deceit, and conduct prejudicial to the administration of justice. The Hearing Board found that, as to all of the clients, the respondent's conduct involved fraud, deceit, dishonesty and misrepresentation, and that his conduct was unethical, unprofessional, and tended to bring the legal profession into disrepute. These findings are supported by clear and convincing evidence. In *In re Jerome* (1964), 31 Ill. 2d 284, this court considered a similar situation and held that the settlement of a civil suit conditioned upon the withdrawal and dismissal of a disciplinary complaint was an attempt to purchase a result in, or to produce an effect on, the disciplinary action. As such, it was "inherently bad, and tended to defeat the administration of justice and to bring the legal profession into disrepute." *In re Jerome* (1964), 31 Ill. 2d 284, 286.

In addition to the two counts involving Stiles, the respondent is charged with misconduct in handling funds of three other clients. On November 30, 1976, Thomas J. Rourke retained respondent to prosecute a claim on behalf of the estate of his deceased wife. In May 1978 respondent received a settlement draft for $10,000. Rourke, at respondent's request, endorsed the draft. At the time, Rourke was not aware the document was a draft. He believed that it was merely some document required by the insurance company. Although Rourke had not authorized the respondent to use his funds and was not aware the respondent had them, the respondent deposited the draft in his client's trust account. During the next year, the balance in the account fell below $10,000

on various occasions when the funds were used by respondent to meet his outstanding personal debts.

In May 1979, one year after the receipt of the settlement draft, the respondent first notified Rourke that he would distribute the funds to him. He did not tell him, however, that he had already converted the proceeds. Without advising Rourke to seek independent legal advice and informing him of his financial problems, the respondent asked Rourke if he would like him to invest the settlement funds and earn a 10% return. He suggested Rourke might like him to make such an investment because of his superior business experience. In their discussions, the parties never characterized this transaction as a loan. Rourke testified he thought respondent was going to invest the funds in "the money market." Rourke agreed to allow the respondent to invest $4,000 of the settlement proceeds. In July 1979 respondent deducted his fee and sent Rourke a settlement check for $3,000 and a 90-day promissory note in the amount of $4,180.33. This amount was not invested but was used by the respondent for his own expenses. At the time of the hearing he still owed Rourke this amount.

On July 28, 1979, Patricia Sapyta retained the respondent to prosecute a personal injury claim. He negotiated a settlement of $10,000. The insurance company made payment of outstanding liens and made one check payable to respondent and Sapyta for $7,550. This check was endorsed by the payees and deposited in respondent's client trust account. Various checks were issued in distribution of the settlement, including a check in the amount of $650 to Dr. Prasit Sri. Shortly thereafter, Sapyta told the respondent that all but $228 of Dr. Sri's bill had been paid. She returned the check to him, asking that the $650 be redistributed. The respondent has made no distribution to date and converted the funds to his

own use.

Sometime before October 24, 1977, the respondent was retained to represent Jennifer Thompson, a minor, in a personal injury claim. On October 24, 1977, the probate division of the circuit court of Cook County entered an order approving a $19,000 settlement in the case. It also approved a distribution which included a $2,792.53 payment to the Illinois Department of Public Aid in satisfaction of its lien, and the payment of attorney fees and costs, and directed that $10,487.38 be deposited to Jennifer Thompson's account at the American National Bank. In violation of the court order, however, the respondent instead deposited the funds in his client trust account, and did not pay the Department of Public Aid or open the account in the name of the minor for over one year. In the meantime, the balance in respondent's trust account fell below the total of the amount the court ordered for these two purposes on various occasions.

In determining whether disbarment is merited in this case, we note that predictability and fairness require a degree of consistency in the selection of sanctions for similar types of misconduct. (*In re Saladino* (1978), 71 Ill. 2d 263.) Intentional conversion of clients' funds has been severely condemned by this court. When a lawyer converts a client's funds to his own personal use, he commits an act involving moral turpitude. In the absence of mitigating circumstances, his conduct warrants disbarment. "Other offenses might be excused, but conversion to his own use of the property of his client is an offense that cannot in any degree be countenanced." (*People ex rel. Black v. Smith* (1919), 290 Ill. 241, 251; see also *In re Feldman* (1982), 89 Ill. 2d 7, 11; *In re Stillo* (1977), 68 Ill. 2d 49, 54.) Each disciplinary case is unique. However, where facts are strikingly similar to those of another case, a degree of uniformity in the dis-

cipline imposed should be sought. *In re Clayter* (1980), 78 Ill. 2d 276, 283.

In *In re Feldman, In re Stillo, In re Smith* (1976), 63 Ill. 2d 250, and *In re Snitoff* (1972), 53 Ill. 2d 50, this court disbarred attorneys for conversion of clients' funds under circumstances no more grievous than those present here. Also, in *Smith* and *Feldman* the court held that adverse circumstances, whether emotional or financial, while unfortunate, afford no excuse for conversion of clients' funds. Also, in *Feldman* several witnesses testified to respondent's good character and trustworthiness. The court held that this evidence would be considered along with all other facts in the case, but that it was not sufficient to overcome the positive facts evidenced by the record. Thus, the financial and emotional problems which the respondent in our case cites as mitigating circumstances, and the testimony as to the respondent's good character presented to the hearing panel, although proper to be considered, do not justify or overcome the serious breach of professional responsibility shown by the record. It is the responsibility of this court, through the use of its disciplinary machinery, to protect the public from conduct such as that demonstrated by this record. By his conduct the respondent not only has breached his professional obligations to his clients and the public, but also has brought the legal profession into disrepute.

In conformity with the practice of this court in similar cases referred to above, we find the appropriate sanction to be imposed is disbarment.

*Respondent disbarred.*