(No. 62275.—

*In re* JAMES CUTRONE, Attorney, Respondent.

*Opinion filed April 4, 1986.—Rehearing denied June 2, 1986.*

MORAN and MILLER, JJ., dissenting.

James J. Grogan, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Feiwell, Galper, Lasky & Berger, Ltd., of Chicago, for respondent.

JUSTICE GOLDENHERSH delivered the opinion of the court:

On November 12, 1982, the Administrator of the Attorney Registration and Disciplinary Commission filed a one-count complaint against respondent, James John Cutrone, who was licensed to practice law on November 15,

1971. The complaint charged respondent with wrongfully commingling and converting a client's funds, thereby breaching his fiduciary duties to his clients, which conduct is unethical, unprofessional and tends to bring the legal profession into disrepute, in violation of Rules 9—102(a) and (b) of the Code of Professional Responsibility (Code) (87 Ill. 2d Rules 9—102(a), (b)); failure to properly maintain records, to render appropriate accountings, and to pay the client those funds which the client was entitled to receive, in violation of Rule 9—102(c) of the Code (87 Ill. 2d R. 9—102(c)); engaging in conduct involving fraud, deceit, and misrepresentation in violation of Rule 1—102(a)(4) of the Code (87 Ill. 2d R. 1—102(a)(4)); and prejudicing or damaging clients during the course of a professional relationship in violation of Rule 7—101(a)(3) of the Code (87 Ill. 2d R. 7—101(a)(3)). Following a hearing, the panel of the Hearing Board recommended that respondent be disbarred from the practice of law. Respondent filed exceptions with the Review Board, which adopted the Hearing Board report and affirmed the recommendation that respondent be disbarred. The report was filed in this court, and we allowed respondent's motion that the exceptions filed to the Hearing Board report stand as exceptions to the report of the Review Board. 94 Ill. 2d R. 753(e)(5).

The record shows that on or about July 10, 1980, Sandra Korb, who respondent had previously represented, was arrested in Venice, California, pursuant to an Illinois arrest warrant. She had fled the State of Illinois after the appellate court had affirmed her conviction for conspiracy to commit theft and forgery. Respondent had represented Ms. Korb before the appellate court in that matter. Following her arrest for "bail jumping" (Ill. Rev. Stat. 1977, ch. 38, par. 32—10) Ms. Korb contacted a friend, Fred Bresler, and her mother, Louise Korb, instructing them to contact respondent concerning her re-

lease from jail in California.

At respondent's request, Louise Korb, Sandra's mother, who lived in Kansas, wired $25,000 to respondent's bank in Chicago. Several days later Bresler delivered to respondent a check in the same amount. The funds received from Louise Korb, and Bresler's check, were deposited into respondent's escrow account, which was used to pay both office and personal expenses. Both Mrs. Korb and Bresler testified that they gave respondent the money because they were told that to effect Sandra's release would require the posting of bail in the amount of $5,000 in cash, none of which was refundable, or $50,000 in cash, all of which would be refunded. In late August 1980, respondent procured the services of the Lewis Bonding Company to act as surety for Sandra Korb's bail bond to secure her release from jail. The bonding company required a security deposit of $25,000, and on approximately August 26, 1980, respondent forwarded a $25,000 certified check to the bonding company. On August 27, 1980, Sandra Korb was released from custody in California.

On approximately September 23, 1980, respondent paid a nonrefundable fee of $7,000 to the bonding company for its services. On or about October 23, 1980, the $25,000 check posted as security was returned to respondent by the bonding company and the proceeds were deposited into respondent's escrow account. Respondent sent $2,257.26 to a California lawyer allegedly for the purposes of paying rent owed for Sandra's apartment, for packing and storage of personal property, and otherwise winding up her affairs.

The testimony is conflicting concerning what respondent was to do with the $50,000. Louise Korb, Sandra Korb, and Fred Bresler testified that the money was given to respondent with the understanding that bail would be posted in the amount of $50,000, and upon dis-

charge of the bail the full amount would be refunded. Louise Korb and Bresler testified that they selected this plan in order to avoid the $5,000 fee incurred if an alternative method were used. Bresler and Mrs. Korb testified that at no time did they authorize respondent to employ a bonding company. Respondent testified that, although he had no conversation with Mrs. Korb concerning the matter, about two days after respondent received his check, Bresler called him on the telephone complaining because Sandra had not been released from custody. He explained to Bresler that the delay was caused by the time necessary to clear the check which Bresler had given him, but that to expedite the matter he could employ a bonding company. He stated that Bresler told him to do so. Bresler does not deny that he authorized respondent to pay the sum of $2,257.26 to the California lawyer, but denies that he at any time authorized an expenditure for a bond fee. Sandra, her mother, and Bresler all testified that they did not at any time discuss fees with respondent for his services, either in arranging bail in California or in representing her in the criminal proceeding involving the bail-jumping charge. Respondent testified that he told Bresler that his fee for representing Sandra was $25,000, and upon completion of the matters he would account to Bresler and Mrs. Korb for any refund to which they were entitled from the money which they had given him. There was also conflicting testimony concerning efforts of Sandra and Bresler to reach respondent, and respondent's testimony that Bresler, on a number of occasions, failed to keep appointments with him. The record shows, too, that respondent represented Sandra in the circuit court, that she pleaded guilty to the charge of bail-jumping, and was sentenced to one year in the penitentiary to be served concurrently with the previously imposed sentence for conspiracy. On April 12, 1984, approximately six days af-

ter the final hearing before the Hearing Board, and after suit had been filed by Bresler and Mrs. Korb against respondent in the circuit court of Cook County, respondent paid Louise Korb and Fred Bresler the sum of $7,946.37 each, and delivered to each of them a promissory note in the amount of $6,000.

The Hearing Board found that there was no agreement on the part of either Mrs. Louise Korb, Sandra's mother, or Bresler to pay respondent a fee and that the $50,000 which he received was "bond money." Although not stated in that precise manner, the Hearing Board apparently concluded that because respondent had represented Sandra on a previous occasion and been paid for his services, that he entered into the arrangement to which Mrs. Korb and Bresler testified without discussing his fee, intending to obtain his fee from Sandra. The Hearing Board found, too, that the sums retained by respondent after the settlement with Mrs. Korb and Bresler were greatly in excess of what would be reasonable payment for the services rendered in arranging bail for Sandra in California and representing her in the circuit court of Cook County.

The Hearing Board found that respondent had received $25,000 from Louise Korb and that she was entitled to a refund in that amount as of October 22, 1980; that respondent commingled those funds and converted them to his own use; that despite repeated efforts on her part to obtain a refund, she has not received an accounting or been paid any money; that Bresler had given respondent $25,000 and was entitled to a refund of that sum less the sum of $2,257.26 paid to a California lawyer; that respondent failed to account to either Mrs. Korb or Bresler; and that he converted the funds to his own use. The panel concluded:

" 'Conversion' is a nice word for 'theft,' and, purely and simply, Respondent stole the money in question.

We conclude that Respondent failed to preserve the identity of a client's funds, that he commingled client's funds with his own and that he converted funds of Mother [Louise Korb] and Friend [Bresler] to his own use. This conduct was unethical, unprofessional and tends to bring the legal profession into disrepute. Respondent failed to maintain records, failed to render accounts, failed to return funds to Mother and Friend paid to him for bail bond funds and, further, engaged in conduct involving fraud, deceit and misrepresentation. This misconduct warrants imposition of the severest of discipline."

The Hearing Board recommended disbarment, and the recommendation was affirmed by the Review Board.

Respondent contends that the findings and recommendation of the Hearing Board are against the manifest weight of the evidence. Citing *In re Enstrom* (1984), 104 Ill. 2d 410, he argues that although the court may give deference to the Hearing Board's findings, it is not required to accept them when they are not established by clear and convincing evidence. He argues that the Board based its findings of fact on the testimony of the Administrator's witnesses without regard to their credibility and the contradictions which appear in their testimony.

We note that in its report, as a preface to "Conclusions of Fact and Law," the Hearing Board panel stated that when testimony of witnesses is in direct conflict, the trier of fact must consider their credibility. The panel stated further that in judging the credibility of the witnesses and in making its decision concerning the weight to be given to the testimony of each of them, it had the opportunity to observe, and took into account, the witnesses, their manner of testifying, their interests, bias or prejudice, and the reasonableness of their testimony considered in light of all of the evidence. The panel stated further that it considered evidence offered in impeachment and noted that conviction of certain crimes could

be considered by the trier of fact.

From our examination of the record we conclude that the Administrator proved by clear and convincing evidence that respondent was guilty of the conversion of funds. The funds were not, as required by Rule 9—102(a), deposited in an identifiable trust account, the account used was frequently depleted and occasionally overdrawn, and respondent's conduct following receipt of the funds held by the bonding company was violative of Rules 9—102(b) and 9—102(c)(1), (c)(3), and (c)(4). Furthermore, assuming that respondent had clearly shown that the question of who was entitled to the money was in dispute, his conduct was violative of Rule 9—102(b).

Despite our agreement with the findings concerning conversion of the funds, we are of the opinion that the record does not contain clear and convincing evidence sufficient to prove that respondent was not authorized by Bresler to employ the bonding company or that he and respondent had not discussed or agreed upon the payment of respondent's fee. The record leaves no doubt that Bresler and Sandra were involved in a close personal relationship and that over a period of several years they had traveled together and he had given her, in cash and by check, thousands of dollars, and had expended substantial sums in purchases made for her. On a prior occasion he had given her the funds with which to pay the attorney who represented her in a criminal proceeding. He was frequently evasive and contradictory in his answers, and there is no evidence to corroborate his testimony. Although there is no testimony that Sandra's mother authorized the employment of a bonding company, she complained that things were moving too slowly and insisted that Sandra's release be effected without delay. Sandra Korb testified that she and respondent had not discussed his fee. There are discrepancies and inconsistencies in her testimony.

As noted by Mr. Justice Frankfurter in *Watts v. Indiana* (1949), 338 U.S. 49, 52, 93 L. Ed. 1801, 1805, 69 S. Ct. 1347, 1349, "there comes a point where this Court should not be ignorant as judges of what we know as men." It strains credulity to believe that an experienced criminal lawyer who had in his possession a substantial sum of money supplied by an incarcerated defendant's mother and good friend, failed to discuss with them the amount of his fee and the method of payment. Furthermore, Bresler's admission of substantial expenditures to and for Sandra, including funds with which to pay an attorney in a criminal case, and the testimony concerning their relationship create doubt as to his credibility. We do not agree with the findings of the hearing and review boards that conversion of all of the funds was shown by clear and convincing evidence.

Conversion of a client's funds, absent mitigating circumstances, can be grounds for disbarment. (*In re Feldman* (1982), 89 Ill. 2d 7; *In re Stillo* (1977), 68 Ill. 2d 49.) In numerous other cases involving conversion of clients' funds, this court, dependent upon the circumstances shown, has imposed suspensions. *In re Pass* (1985), 105 Ill. 2d 366 (two years); *In re Webb* (1985), 105 Ill. 2d 360 (two years); *In re Bizar* (1983), 97 Ill. 2d 127 (one year); *In re Grant* (1982), 89 Ill. 2d 247 (two years); *In re Brody* (1976), 65 Ill. 2d 152 (one year).

In mitigation respondent states that the evidence shows that during the period relevant here he was having serious personal and financial problems. He was supporting two children from his first marriage and was experiencing difficulties with his second marriage, which in 1981 ended in divorce. During that same period his financial difficulties resulted in his office being seized in a levy by the Internal Revenue Service. He points out, too, that he represented Sandra Korb with diligence and that the prosecution for bail-jumping was concluded in a sen-

tence to be served concurrently with her earlier sentence and did not extend the period of confinement in the penitentiary. He argues that his settlement with Louise Korb and Bresler demonstrates his desire to make proper restitution and that after the expenditures were made he was left with a fee of approximately 50% of the amount expected.

This court has held that evidence of adverse circumstances, personal or financial, does not excuse conversion of clients' funds (*In re Woldman* (1983), 98 Ill. 2d 248, 258), nor does restitution after a complaint has been filed excuse such acts. (*In re Abbamonto* (1960), 19 Ill. 2d 93, 97.) Evidence of these factors will be considered with all other evidence in the case but is not sufficient to overcome respondent's misconduct.

We recognize the desirability of uniformity in the application of sanctions in attorney disciplinary matters; however, comparisons and analyses of the facts demonstrate that each case must be determined on its own merits. Simply stated, this case involves the basic question whether respondent converted funds and a secondary question of how much, if any, of the money he was entitled to retain. The conversion and failure to comply with Rule 9—102(b) were proved by clear and convincing evidence and require the imposition of an appropriate sanction. Assuming, *arguendo*, that the record shows by clear and convincing evidence that respondent was not authorized to pay the bonding company or withhold his fee from the funds, the misconduct can be compared to that shown in *In re Crane* (1983), 96 Ill. 2d 40. In *Crane*, the attorney was charged with improperly obtaining funds from the minor beneficiaries of the settlement of a claim for their mother's wrongful death. There was conflicting testimony concerning the amount of the fee due him and the impropriety of the manner in which he had obtained payment, aggravated by testimony that he

had instructed his clients to lie to the court in the event that the payments were questioned. Upon consideration of the facts and comparison with other disciplinary matters, the court concluded that a suspension for a period of three years was an appropriate sanction. In our opinion, the violation here was less reprehensible than that in *Crane*. The primary considerations in determining the nature and extent of discipline to be imposed in any particular case are the protection of the public and the integrity of the profession. (*In re Grant* (1982), 89 Ill. 2d 247, 254.) We conclude that the appropriate sanction here is that respondent be suspended for a period of two years.

*Respondent suspended.*

JUSTICE MORAN, dissenting:

In the all-too-numerous instances where this court has imposed sanctions on attorneys for converting client funds, it has repeatedly emphasized that, "in the absence of mitigating circumstances, such conversion is a gross violation of the attorney's oath, calling for the attorney's disbarment." (*In re Stillo* (1977), 68 Ill. 2d 49, 54. See also *In re Woldman* (1983), 98 Ill. 2d 248, 257; *In re Smith* (1979), 75 Ill. 2d 134, 142.) " 'Other offenses might be excused, but conversion to his own use of the property of his client is an offense that cannot in any degree be countenanced.' " (*In re Stillo* (1977), 68 Ill. 2d 49, 54, quoting *People ex rel. Black v. Smith* (1919), 290 Ill. 241, 251.) Considering the "gross violation of the attorney's oath" which occurred here and the lack of any circumstances which would excuse or justify respondent's actions, I would follow the hearing and review boards' recommendations that the respondent be disbarred.

This court has recognized that every attorney disciplinary case is unique and that a case must be judged ac-

cording to its own particular circumstances. (*In re O'Hallaren* (1976), 64 Ill. 2d 426, 433.) However, "predictability and fairness require a degree of consistency in the selection of sanctions for similar types of misconduct." (*In re Saladino* (1978), 71 Ill. 2d 263, 275.) As such, "where the facts are similar to those in other cases, a uniform standard of discipline should be sought." *In re Feldman* (1982), 89 Ill. 2d 7, 11. See also *In re Enstrom* (1984), 104 Ill. 2d 410, 416; *In re Woldman* (1983), 98 Ill. 2d 248, 257-58.

In *In re Smith* (1976), 63 Ill. 2d 250, the attorney, with his client's consent, deposited a $69,999 settlement check in his personal bank account. It was agreed that he would hold the client's share of the settlement proceeds until the client reached the age of 21. After paying a $9,000 debt owed by the client out of the settlement proceeds, the attorney made unauthorized use of the balance of the funds. Only after the commencement of disciplinary proceedings was the client fully reimbursed. The record in *Smith* also revealed that the attorney had serious personal, family and financial problems at the time he converted the money, including the suicide of his daughter, a divorce, and the foreclosure of his house. He also related that following the suicide of his daughter he had been "drinking heavily" but since then had been able to " 'turn himself around.' " (*In re Smith* (1976), 63 Ill. 2d 250, 255.) While the court acknowledged that he was "experiencing severe financial and emotional problems at the time of the settlement," and that he had converted the funds of only one client, it nonetheless concluded that his disbarment was necessary to " 'safeguard the public, maintain the integrity of the legal profession and to protect the administration of justice from reproach.' " 63 Ill. 2d 250, 255-56.

The misconduct of the respondent is at least as serious, if not more so, than the misconduct of the attorney

in *Smith*. The record shows that respondent converted large sums of money from two persons, that he refused to repay any of the converted funds for almost four years despite repeated demands for return of the money, and that respondent made partial restitution of the money only after Louise Korb and Bresler filed a lawsuit against him and only after the Hearing Board had concluded the hearings in this disciplinary action. Moreover, respondent admitted before the Hearing Board that he still owed Louise Korb and Bresler each $6,000. No evidence has been presented which shows that he has repaid this money. Finally, although respondent had some financial and personal problems at the time he converted the money, these problems certainly were not more serious than the circumstances of the attorney in *Smith*. Since the facts here are very similar to those in *Smith*, I think that "predictability and fairness" require us to order respondent's disbarment.

For the reasons stated, I must respectfully dissent.

JUSTICE MILLER joins in this dissent.