(No. 60245. )

*In re* GEORGE EDMUND ENSTROM, Attorney,
Respondent.

*Opinion filed November 30, 1984.*

Theresa M. Gronkiewicz, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

George B. Collins, of Collins, Amos & Uscian, of Chicago, for respondent.

CHIEF JUSTICE RYAN delivered the opinion of the court:

In this disciplinary proceeding, the Administrator for the Attorney Registration and Disciplinary Commission charged respondent, George Enstrom, with forging an endorsement on a settlement draft, commingling client funds with his own personal funds, and converting a portion of the settlement funds. Specifically, the Administrator asserted that respondent's conduct violated Rules 9—102(a) and (c), 1—102(a)(4), and 1—102(a)(3) of the Code of Professional Responsibility (94 Ill. 2d Rules 9—102(a), (c); 87 Ill. 2d Rules 1—102(a)(4), 1—102(a)(3)). The Hear-

ing Board found that respondent lacked authority to endorse the draft, commingled funds, and that a portion of the funds was converted when the Internal Revenue Service levied on respondent's bank account. Based on its findings, the Hearing Board recommended that respondent be censured. Both the Administrator and respondent filed exceptions with the Review Board. The Review Board, without opinion, affirmed the Hearing Board's findings and recommendations. The Administrator then filed exceptions in this court pursuant to Rule 753(e)(6) (94 Ill. 2d R. 753(e)(6)).

Respondent was admitted to practice in this State on May 18, 1976. In early 1979, he was associated with the law firm of Mitan and Michellotti. While with that firm, respondent represented Arlon and Gary Cooper in a personal injury claim against an insured of Home Insurance Company.

In January 1979, Mitan was disbarred (*In re Mitan* (1979), 75 Ill. 2d 118), and the firm of Mitan and Michellotti was dissolved. Respondent then became a partner in a new firm called McAuliffe and Enstrom. Various files, including the Cooper file, were transferred to the new firm. During his representation of the Coopers, respondent received notice of a subrogation lien in the Cooper case in the amount of $6,085 in favor of Crum and Forster Insurance Company. Through negotiations, respondent was able to reduce the amount of the lien to $3,500.

In early June 1980, respondent reached a settlement with Home Insurance Company. Under the settlement, Home Insurance Company agreed to pay a total of $34,000; $33,000 to Gary Cooper and $1,000 to Arlon Cooper. Shortly thereafter, the firm of McAuliffe and Enstrom suddenly dissolved. Respondent testified that he went to work one morning and McAuliffe had disappeared, along with all the files, including the Cooper file, which contained his notes pertaining to the case.

On or about June 6, 1980, respondent received two settlement drafts from Home Insurance Company, one payable to "Gary Cooper and Irene Cooper individually and as husband and wife and their attorney George Enstrom and Crum and Forster Insurance Co.," the other payable to "Arlon Cooper and his attorney George Enstrom." Respondent had the Coopers endorse the drafts. He then signed his name and that of Crum and Forster on each draft. Respondent testified that, prior to receiving the drafts, he had two conversations with representatives of Crum and Forster. Respondent stated that in the first conversation he indicated that a settlement was pending and that he desired to know the mechanics for depositing and distributing the funds. According to respondent, the representative indicated that he was unfamiliar with the procedure and would have to check on the matter. Respondent further testified that in the second conversation he spoke with two claims adjusters. Although he could not identify the individuals—other than to say they were both males—he stated that one of the adjusters gave him authorization to sign Crum and Forster's name and that the adjuster indicated that "they would be happy as long as they got their $3,500."

The only witness called by the Administrator was Donald Penticoff, claims supervisor for the United States Insurance Group, a division of Crum and Forster. He testified that company policy prohibits anyone from signing the company's name to a settlement draft. According to Mr. Penticoff, when a draft is made payable to a number of payees including Crum and Forster, their policy is to have the other payees endorse the draft and send it to the company. Crum and Forster then issues new drafts to the individuals in the amounts to which they are entitled.

After endorsing the settlement drafts, respondent, on June 16, 1980, opened a personal account with the funds

at the American National Bank. At the time, he had two client fund accounts at the bank. Three days later, respondent, after deducting attorney fees, medical report costs, and the amount of the subrogation lien, paid the funds owed the Coopers. However, while respondent never withdrew any of the settlement funds for his own use or benefit, he failed to pay the $3,500 owed to Crum and Forster.

In October 1980, the Internal Revenue Service levied on respondent's personal bank account. The levy purportedly resulted because of withholding taxes owed by the defunct firm of Mitan and Michellotti, not because of any delinquencies by respondent. In any event, as a result of the levy, respondent's personal bank account was closed, and he was unable to pay the subrogation lien owed to Crum and Forster.

Later in the fall or winter of 1980, Crum and Forster contacted respondent and requested payment. In March 1981, having failed to receive payment, North River Insurance Company, a division of Crum and Forster, filed suit against Gary Cooper, respondent and Home Insurance Company. Although respondent was aware of the action, he did not file an appearance, and in October 1981, judgment was entered against him for $3,500. It was not until October 1983, however, after the present complaint was filed, that respondent paid the money owed.

It is the Administrator's position that respondent's conduct warrants a suspension, not merely a censure as recommended by the hearing and review boards. Respondent, on the other hand, disputes the Hearing Board's finding that he forged the endorsement of Crum and Forster. He concedes, however, that his conduct justifies disciplinary action and urges this court to accept the recommendation of censure.

We first consider the Hearing Board's finding that re-

spondent forged the endorsement of Crum and Forster. It is, of course, essential that the Administrator prove each allegation by clear and convincing evidence. (*In re Woldman* (1983), 98 Ill. 2d 248, 254; 87 Ill. 2d R. 753(c).) Although we give considerable deference to the Hearing Board's findings, "we are not required to accept them when the Board's conclusion is not established by clear and convincing evidence." *In re Levin* (1984), 101 Ill. 2d 535, 539-40.

The Administrator contends that clear and convincing evidence established that respondent lacked authority to endorse Crum and Forster's name. We disagree. There was no evidence that directly contradicted respondent's testimony as to his authority to endorse the draft. Ronald Eldridge, the claims adjuster in charge of the Cooper file, and the one with whom respondent usually dealt, was not called as a witness. Other than to say that Eldridge had been on disability leave until two weeks prior to the hearing as a result of injuries suffered in 1981, the Administrator made no showing that he was unable to testify. The Administrator contends that since respondent could not identify the adjuster who allegedly gave him authorization to sign the draft, even if Eldridge did testify, it does not follow that he would refute respondent's testimony. We will not speculate as to that. We do not believe, however, that Penticoff's testimony regarding Crum and Forster's company policy was sufficient, standing alone, to establish by clear and convincing evidence that respondent forged the endorsement.

We now turn to the question of the appropriate sanction to be imposed. In making the determination, we seek to prescribe similar sanctions for similar types of misconduct (*In re Woldman* (1983), 98 Ill. 2d 248), although we recognize that each case is unique and must be decided on its own facts (*In re Crisel* (1984), 101 Ill.

2d 332; *In re Feldman* (1982), 89 Ill. 2d 7).

We are unaware of any case with facts analogous to those present here. Unlike numerous other cases involving commingling and conversion, respondent did not directly convert the funds himself, nor did he utilize them for his personal use or benefit. (Compare, *e.g., In re Woldman* (1983), 98 Ill. 2d 248; *In re Cohen* (1983), 98 Ill. 2d 133; *In re Feldman* (1982), 89 Ill. 2d 7; *In re Stillo* (1977), 68 Ill. 2d 49.) Rather, after depositing the settlement funds in his personal account and paying his clients, the balance was converted by operation of law when the IRS levied on respondent's account.

Nevertheless, respondent's conduct constituted a serious breach of his professional and ethical duties. Rule 9—102 of the Code of Professional Responsibility provides that an attorney must deposit client funds into "one or more separate identifiable trust accounts." (94 Ill. 2d R. 9—102(a).) In *In re Clayter* (1980), 78 Ill. 2d 276, 281, we observed that commingling of funds is often the first step toward conversion. There we made clear "that it is absolutely impermissible for an attorney to commingle his funds with those of his client." (78 Ill. 2d 276, 278-79.) This proscription is designed to protect not merely funds owed to a client but any money held by an attorney that rightfully belongs to another. (78 Ill. 2d 276, 281.) The rule is intended to guard not only against the actual loss of the funds but also against the risk of loss. (*In re Bizar* (1983), 97 Ill. 2d 127, 132.) Thus, we have recognized that when funds belonging to another are commingled with an attorney's own funds, they may become subject to the claims of creditors. (97 Ill. 2d 127, 132.) Similarly, in the case of death or insolvency of the attorney, there is a danger of conversion by operation of law. *In re Clayter* (1980), 78 Ill. 2d 276, 281.

This case demonstrates further justification for requiring attorneys to segregate funds belonging to others

in a separate trust account. Here, the $3,500 subrogation lien owed to Crum and Forster was converted by operation of law when the IRS levied on respondent's personal account. Moreover, by failing to preserve the identity of the settlement funds in a separate trust account, respondent put the entire proceeds at risk. If, for example, the IRS had levied on his account prior to his payment to the Coopers, he would have been unable to pay either Crum and Forster or his clients. For these reasons, we reiterate what we said in *In re Clayter*: it is impermissible, under any circumstances, for an attorney to commingle funds rightfully belonging to another. "[I]t is essential that such money be held in such a manner that there can be no doubt that the attorney is holding it only for another and that the money does not belong to him personally." 78 Ill. 2d 276, 281.

Apart from commingling funds, respondent failed to make any effort to pay the $3,500 subrogation lien to Crum and Forster. The funds remained in respondent's account for almost three months before they were seized by the IRS, and then another three years passed before respondent remitted the amount owed. He ignored Crum and Forster's request for payment as well as the judgment that was entered against him in 1981. Such a disregard of his professional and legal obligation tends to bring the legal profession into disrepute and cannot be tolerated. Moreover, because of his dilatory conduct, respondent caused one of his clients to be named a defendant in a suit to recover the proceeds.

Although we consider respondent's actions to be serious breaches of his professional and legal obligations, we deem it significant that: (1) he did not convert the funds to his own use or benefit; (2) this was an isolated act of professional misconduct (*In re Freel* (1982), 89 Ill. 2d 263, 270); and (3) there was no evidence of dishonest motive (*In re Clayter* (1980), 78 Ill. 2d 276, 283). In addi-

tion, we note the unusual events which occurred during respondent's representation of the Coopers. Two of the firms of which he was a member suddenly dissolved, and in the second instance, the case file disappeared. Although the resulting confusion which surrounded these breakups does not excuse respondent's conduct (see, *e.g., In re Smith* (1976), 63 Ill. 2d 250, 255 (adverse circumstances will not excuse misconduct)), it is a factor properly considered in determining an appropriate sanction (*In re Saladino* (1978), 71 Ill. 2d 263, 275 (relevant factors may always be considered in mitigation)).

The purpose of attorney discipline is to "maintain the integrity of the legal profession, to protect the administration of justice from reproach, and to safeguard the public." (*In re LaPinska* (1978), 72 Ill. 2d 461, 473.) We do not believe that any of these objectives would be furthered by suspending the respondent. Rather, given all the circumstances of this case, we believe that censure is an appropriate sanction.

*Respondent censured.*