(No. 64777.

*In re* JOSEPH ROSIN, Attorney, Respondent.

*Opinion filed October 5, 1987.—Modified on denial
of rehearing December 1, 1987.*

CUNNINGHAM, J., took no part.

James J. Grogan, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

George B. Collins, of Collins & Bertelle, of Chicago (Joseph A. Rosin, *pro se*, and Robert A. Rosin, of counsel), for respondent.

CHIEF JUSTICE CLARK delivered the opinion of the court:

In this disciplinary proceeding the Administrator for the Attorney Registration and Disciplinary Commission charged the respondent, Joseph Rosin, with various violations of the Code of Professional Responsibility in a three-count complaint. All of the violations charged in the three counts related, directly or indirectly, to the respondent's conduct in connection with the distribution and investment of his client's settlement proceeds.

The first count charged that the respondent's conduct in connection with his client's investment in a small,

close corporation violated the Code in several different ways, including: (1) failing to refuse to undertake employment when his personal interests could have influenced his personal judgment, in violation of Rule 5—101 of the Code of Professional Responsibility (107 Ill. 2d R. 5—101); (2) failing to avoid the influence of persons other than the client in violation of Rule 5—107 of the Code (107 Ill. 2d R. 5—107); (3) failing to represent the client with undivided fidelity in violation of Rule 5—107(a) of the Code (107 Ill. 2d R. 5—107(a)); (4) prejudicing or damaging the client in violation of Rule 7—101(a)(3) of the Code (107 Ill. 2d R. 7—101(a)(3)); and failing to limit business relations with the client in violation of Rule 5—104 of the Code (107 Ill. 2d R. 5—104). Count II charged that the respondent committed various breaches of the Code in connection with the use of the proceeds of the client's settlement to pay a personal debt of his own, including prejudicing or damaging the client in violation of Rule 7—101(a)(3) of the Code (107 Ill. 2d R. 7—101(a)(3)), and failing to maintain the integrity of the legal profession in violation of Rule 1—101 of the Code (107 Ill. 2d R. 1—101). Count III charged the respondent with making false statements to the Commission during the investigation of the other charges, thereby committing misrepresentation violative of Rule 1—102(a)(4) of the Code (107 Ill. 2d R. 1—102(a)(4)).

The Hearing Board found that the Administrator had proved counts I and II of the complaint, but dismissed count III for lack of sufficient proof. Based on these findings, the Hearing Board recommended that the respondent be suspended for a period of three months. Both the Administrator and the respondent filed exceptions with the Review Board. The Review Board dismissed all three counts. The Administrator then filed exceptions in this court pursuant to Rule 753(e)(6) (107 Ill. 2d R. 753(e)(6)).

The charges at issue stem from the respondent's dealings with his client, Julia Fann. On December 23, 1974, Julia Fann was driving on Roosevelt Road through West Chicago, Illinois, when her auto was struck by a semi-trailer truck. She suffered personal injuries, which required her admission to Central DuPage Hospital with head wounds, multiple contusions, speech difficulty, quadriparesis, and bladder incontinence. Fann testified, as affirmed by medical records, that she was unconscious for about a week after the accident and suffered from amnesia for several weeks. Pleadings filed in Fann's personal injury suit state she also suffered chronic post-traumatic organic brain disturbance that caused intellectual defect and a reduced capacity to deal with daily stresses and strains.

The day after the accident, while Fann was still unconscious at the hospital, attorney W. Jason Mitan appeared at Julia Fann's brother's home, uninvited and unannounced. Mitan persuaded Fann's brother that he would protect Fann's welfare and make sure that her children were taken care of. Fann's brother then signed a retainer agreement empowering Mitan to represent his sister in any personal injury claim she might assert.

On March 24, 1975, Mitan filed suit on Fann's behalf against the parties allegedly liable for her injuries. After suit was filed, Mitan referred Fann's case to the respondent.

Mitan was disbarred by this court in January 1980 for making material false statements on his application for admission to the Illinois Bar. (*In re Mitan* (1979), 75 Ill. 2d 118, *cert. denied* (1979), 444 U.S. 916, 62 L. Ed. 2d 171, 100 S. Ct. 231.) The respondent served as Mitan's attorney during the disbarment proceedings before this court. In addition, the respondent was a personal friend of Mitan for several years prior to his disbarment,

and they enjoyed a longstanding professional and social relationship.

The Fann case was only one of several personal injury cases which Mitan referred to the respondent. The respondent himself estimated that Mitan referred to the respondent during the course of their business relationship 13 cases, many of which resulted in multimillion dollar settlements.

Whenever Mitan referred a case to him, the respondent would give Mitan "an advance on fees." The amount of money paid Mitan depended upon whether, in the respondent's words, "a given case was meritorious." This arrangement continued up until Mitan's disbarment. Money thus was passed from the respondent to Mitan and from Mitan to the respondent throughout the duration of their professional relationship. At the time of Mitan's disbarment, the respondent owed Mitan $150,000. He eventually paid this money to a licensed attorney named Wilcox, whom the respondent described as Mitan's "successor in interest."

In October of 1975, Mitan and the respondent went to visit Fann in the hospital. The respondent asked Fann questions about the accident, but she remembered little because of her amnesia. Subsequently, Fann entered into a written contract with the respondent for legal services. Under the terms of the agreement, Fann retained the respondent as "additional counsel" with Mitan and Michelloti, Ltd. The lawyers were to receive 33⅓ % of any settlement unless suit was filed. In the event suit was filed and the case was assigned for trial, the lawyers would receive 40% of any settlement. Mitan and the respondent agreed between themselves that the respondent would receive 37½ % from the attorney fees recovered in the case. In addition, the respondent paid Mitan an "advance on fees" of $45,000.

After the respondent was retained, Fann dealt primarily with the respondent. She rarely spoke with Mitan concerning her case, feeling that she could not trust him. In her words, the respondent was the only attorney she spoke with because: "He was the only one I trusted."

After being retained, the respondent learned that Fann had severe psychological problems and was diagnosed a schizophrenic following post-accident examinations by several psychiatrists and psychologists. She was raised in rural southern Illinois and completed an 11th-grade education. Prior to her accident, she was estranged from her husband and ostracized by her family. She was responsible for raising four young children while earning $6,988.80 a year at her job on an assembly line at a Batavia, Illinois, factory.

Within 18 months after the accident, Fann incurred $43,871.51 in medical bills and had been hospitalized or received out-patient care at seven different hospitals and psychiatric facilities for recurrences of depression and attempted suicides.

From the time of her accident until May 1979, Fann frequently was under the influence of Valium, Darvon, and Placidyl, which were prescribed to her on a regular basis. The respondent considered Fann a "pill-taker." In synergism with her physical and mental condition, the drugs would cause Fann to suffer from poor memory, dizziness, fainting spells and blackouts.

Between October 1975 and May 1977, the respondent prepared Julia Fann's case for trial. During this period, the respondent developed a relationship with his client which he himself characterized as "unusually close." He would lend money to her and contacted social services agencies on her behalf or for her children.

In May 1977, after five days of trial, the respondent settled Julia Fann's injury case for $435,000. On May 16, he provided Fann with a written guarantee that she

would receive $200,000 as her share of the settlement proceeds after deduction of his costs and loans. Mitan and the respondent were to share $174,000 of the settlement as attorney fees.

On June 17, 1977, checking account number 20-03309-8 at Bank Leumi, Chicago, was opened by Mitan in the name of Julia Fann with a $1 deposit. On the same date he had her sign the account signature card. Fann was unaware that she could not draw checks on the account without the co-signature of one of Mitan's secretaries. She never possessed the checkbook, and did not receive any monthly statements.

In either May or June of 1977, the respondent received three settlement drafts from various insurance companies responsible for making the settlement payments. The first settlement check the respondent received was made payable to the respondent, Julia Fann, and the law firm of Mitan and Michelotti in the amount of $185,000. The respondent endorsed the check and forwarded it to Mitan. The second settlement check the respondent received was made payable to Northwestern Memorial Hospital and was drawn in the amount of $28,245. The respondent forwarded this check to the named payee. Finally, the respondent received a check payable to himself, to Julia Fann, and to Mitan and Michelotti in the amount of $221,775. The respondent obtained the signatures of the other named payees on the draft and deposited the proceeds into his special account at the Chicago-Tokyo Bank. From the proceeds of this third settlement draft the respondent deducted fees and costs owed him for his work in the Fann case.

On June 29, 1977, the respondent sent a check to Mitan, payable to Fann and Mitan in the amount of $98,636.46. After receiving the check, Mitan gave the respondent a written receipt representing that Mitan had received $143,636.46 from the respondent.

Before Fann received her "guaranteed" $200,000 share of the settlement proceeds, the sum of $112,800 was expended from her funds in the following manner: (1) $12,800, by a check dated June 22, 1977, and made payable to Julia Fann, was used to pay, in part, gambling debts incurred by the respondent at the Las Vegas MGM Grand Hotel, and (2) $100,000, by a check dated June 22, 1977, was issued to the Chambers Stamp Company and David Blair, purportedly as an investment in that company. On the reverse side of the check the following words were typed: "Loan to be repaid in monthly interest payments of $1,000.00 per month starting immediately. Mrs. Fann shall receive 12% per year on investment and principal to be returned as agreed by the parties." This agreement contained no other provisions for security. To understand the significance of these disbursements it is necessary to review the evidence relating to the respondent's gambling debt and the origin of the Chambers Stamp Company.

During 1977, the respondent and Mitan traveled together to Las Vegas. The respondent at that time sustained a $13,800 gambling obligation to the MGM Grand Hotel. Within several weeks of his return from Las Vegas, $12,800 of the respondent's gambling debt was paid on a check drawn by Mitan on Fann's settlement account at Bank Leumi. At the time the obligation was paid, the respondent owed no other money to any other casino.

Fann testified that she was never informed that the money would be used to pay the respondent's gambling debts. She stated that Mitan had her sign several checks drawn in blank on the account. The check used to pay the respondent's gambling debt was subsequently processed through a collections service employed by the MGM Grand Hotel to collect outstanding obligations.

The respondent's involvement with the Chambers Stamp Company came about as follows. The respondent, a trial attorney, frequently practices before the law division of the circuit court of Cook County. Until 1979 and during the time of the events recounted here, Robert McAuliffe was a circuit judge assigned to the law division. After 1974, the respondent tried several cases before McAuliffe, and also enjoyed a close personal relationship with the judge. McAuliffe resigned from the bench in 1979, and later was himself the subject of disciplinary action. See *In re McAuliffe* (1987), 116 Ill. 2d 254.

Judge McAuliffe was a philatelist. He not only collected stamps, but was also interested in the business of selling collectors' stamps. Together with a man named David Blair, McAuliffe was involved in the operation of a stamp business known as the Chambers Stamp Company, although all of the stock was held by David Blair. The name "Chambers" was a "poetic" reference to Judge McAuliffe's judicial "chambers." The respondent, although not himself a stamp collector, assisted McAuliffe in obtaining an interest in another stamp company, Bob Weisz Stamps, Inc.

This company was owned by Robert Weisz, who had been a stamp dealer for 20 years. Located in Arlington Heights, the company was involved in organizing and operating stamp auctions. In 1977, David Blair purchased a half interest in Bob Weisz Stamps, Inc. Weisz owned the remaining half interest.

In September 1977, Judge McAuliffe informed the respondent that Bob Weisz Stamps, Inc., needed $25,000 to purchase a block of stamps. As an "accommodation" to the judge, the respondent loaned $25,000 to David Blair. Blair, Weisz, and McAuliffe then signed a promissory note evidencing the loan. The respondent was re-

paid at the end of 30 days and received $500 in interest on the loan.

In November 1977, Weisz developed a heart problem which required bypass surgery. Shortly after his hospitalization, Weisz received word that a special meeting of shareholders and directors of Bob Weisz Stamps, Inc., would be held at the respondent's office on December 20, 1977. Both Robert Weisz and his brother, attorney Daniel Weisz, went to the respondent's office that day. Present at the meeting were the respondent, David Blair, and another corporate director.

During the meeting, the respondent informed Daniel Weisz that, "Your brother [Bob] is out. And we'd like to do this friendly and peacefully. We want to do something fair with him, and so we will decide to pay him something for his stock, and get him off the payroll."

In the negotiations which followed, the respondent was the lead negotiator involved with the buy out of Weisz' interest in the corporation. During the course of the negotiations, the respondent spoke on behalf of the corporation and Judge McAuliffe. During the December 20 meeting, the respondent was in phone contact with McAuliffe, and kept him informed of the status of the proceedings. Eventually, McAuliffe appeared at the respondent's office and participated in the discussion.

After more meetings in December and January, conducted in McAuliffe's chambers, a sales agreement was negotiated. Under the terms of this agreement, Weisz would sell his interest in the business for $60,000 to be paid at the time the agreement was executed and an additional $10,000 in installments. As an accommodation to McAuliffe, the respondent gave Bob Weisz a personal check for $60,000 at the time the document was executed in January 1978. He was eventually paid half of that amount, but has never collected the remaining $30,000.

Julia Fann's involvement with Chambers Stamp Company predated these events by several months. The respondent initially testified under oath, during a Commission investigation, that Fann had first discussed with him in June 1977 whether she wished to invest money in Chambers Stamp Company. In 1984, however, the respondent testified before the Hearing Board that Fann had never consulted him concerning any investment, and contended that Jason Mitan asked him to prepare investment documents. According to this version of the story, the respondent drafted the investment agreement on behalf of Fann, his client, in order to "protect the lady's interests," although he did not speak with Fann before preparing the document. Respondent admitted that he did not undertake any investigation of the company on behalf of his client other than asking McAuliffe for an opinion. Respondent testified that he "knew McAuliffe to be in the business, and I just thought that would be for the benefit of the lady, would serve her purpose and serve the purpose of this company."

The respondent first prepared an investment agreement dated June 22, 1977. A check issued on the same date from Fann's account at Bank Leumi was made payable to the Chambers Stamp Company and David Blair in the amount of $100,000. This check had the typed one-sentence agreement quoted above, with no provision for security, on the back. Fann testified that she had no knowledge of this check, had not directed anyone to invest her money in the Chambers Stamp Company, and could only recall signing blank checks when asked to by Jason Mitan.

The first draft agreement prepared by the respondent included a date for repayment. Under this draft agreement, Mitan guaranteed Fann's loan to the stamp company, and Mitan and the respondent were given a security interest. The respondent would hold certain shares

of Bob Weisz Stamps, Inc., as security for the loan. The provision setting forth Mitan's guarantee was later stricken on the original document and initialed by the respondent. This document was never signed by Julia Fann.

At some time between June and November 1977, Fann testified that she met with the respondent to discuss this draft agreement. During their meeting, the respondent assured his client that she was making a good investment and told her that she would earn interest on her loan. After the meeting, Fann took the document home but still did not sign it.

On or about August 8, 1977, the respondent forwarded a second version of the investment agreement to Fann with a cover letter. The new draft, also dated June 22, 1977, provided that Fann would loan $100,000 to David Blair and Chambers Stamp Company for one year at 12% interest. Fifty percent of David Blair's stock in Bob Weisz Stamps, Inc., was pledged as collateral. The agreement was signed only by David Blair. With his letter of August 8, 1977, the respondent sent Fann a copy of a note payable to her in the amount of $100,000 and the note signed by Blair.

While Fann received this second draft agreement, she did not immediately sign and return it. Despite her failure to sign the agreement, she began receiving $1,000 a month from Chambers Stamp Company, beginning in July 1977 and continuing for about five months.

In November 1977, Fann contacted David Blair on her own. She learned of his whereabouts from his address on the monthly checks she received. Blair met with her, gave her $10,000 as payment on principal, and persuaded her to sign the investment agreement.

On July 31, 1978, the $100,000 note signed by Blair became due. Instead of repaying the note, Blair took Fann out to dinner and provided her with a loan exten-

sion agreement. Fann continued to receive interest until sometime in 1979. She also received another $5,000 as payment of principal. In late 1979 all payments, of interest and principal, ceased and, according to Fann, "everybody disappeared."

In late 1979, Fann filed charges with the Commission against Mitan and the respondent. Shortly after her complaint was filed, an Administrator's subpoena *duces tecum* was personally served upon the respondent. He was asked to produce all records relating to Julia Fann and her investment. In response to the subpoena, the respondent sent several letters to the Commission and produced certain documentation.

On February 27, 1980, a second subpoena was served upon the respondent. Pursuant to this subpoena, the respondent appeared in the Commission's Chicago office on March 5, 1980, and testified about his relationship with Julia Fann. At the session the respondent testified under oath that he had only met David Blair once, had never had any dealings with him, and did not believe that Blair was associated with Judge McAuliffe in the stamp business. He claimed that Fann's investment in the the stamp business was a *"fait accompli* by the time it even came to me. Julia simply told me that she wanted to make this investment and she had talked to this fellow Blair or to Mitan or whoever it was. And she asked me to prepare the document."

Two days after his testimony before the Commission, the respondent met with Julia Fann in his office. He gave Fann a written statement, which she signed. The statement reads, in pertinent part, "I so understand that Mr. Rosin prepared my loan papers with the Stamp Company, but I did not know that at the time. Joe Rosin never told me to make this investment. I never discussed [it] with him at all ***. Joe Rosin has said to me that he does not feel good about the transaction, and that he will

guarantee the note to the extent of $65,250." This amount, less than the total outstanding principal, was apparently the amount of the respondent's fee in the personal injury case. Some time after the statement was signed, the respondent gave his client a check for $6,646 so that she could purchase a new Buick automobile.

On March 27, 1980, the respondent learned that the Commission was investigating the payment of his gambling debts from Julia Fann's personal injury proceeds. Shortly thereafter, the respondent paid Julia Fann $58,404, and had her sign an assignment of a proportionate interest in her note with David Blair.

To date the respondent has not received any payment from Chambers Stamp Company after Fann executed the assignment of her interest. The respondent was later told by Judge McAuliffe that there was a robbery and that someone stole all of the inventory of the Chambers Stamp Company.

The pertinent principles applicable to our review of the Hearing Board's decision have been stated many times. The Administrator must prove each allegation by clear and convincing evidence. (*In re Enstrom* (1984), 104 Ill. 2d 410, 416; *In re Woldman* (1983), 98 Ill. 2d 248, 254; 107 Ill. 2d R. 753(c).) The Hearing Board's findings are entitled to the same weight as that of any other fact finder. (*In re Levin* (1984), 101 Ill. 2d 535, 539.) While we give considerable deference to findings of fact by the Hearing Board, we are not required to accept them when the Board's position is not established by clear and convincing evidence. 101 Ill. 2d 535, 540; *In re Kink* (1982), 92 Ill. 2d 293, 301.

Count I charges that the respondent's conduct in connection with the investment violated several different sections of the Code of Professional Responsibility. Since the evidence relating to some of the charges overlap, they will be considered together.

The respondent is charged with violating Rule 5—101(a). Rule 5—101(a) provides, in pertinent part, that a lawyer shall not, "[e]xcept with the consent of his client after full disclosure, *** accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." (107 Ill. 2d R. 5—101(a).) As to this rule, the theory of the Administrator, as we understand it, is that Rosin should not have accepted the task of drafting the investment document on behalf of Fann without first disclosing to her that his judgment on her behalf might be affected by his personal and professional relationship with Robert McAuliffe.

The respondent is also charged with violating Rules 5—107(a) and 7—101(a)(3). Rule 5—107(a) provides that a "lawyer shall represent his client with undivided fidelity." (107 Ill. 2d R. 5—107(a).) Rule 7—101(a)(3) provides that "[a] lawyer shall not intentionally *** prejudice or damage his client during the course of the professional relationship ***." (107 Ill. 2d R. 7—101(a)(3).) The theory of the Commission, as we understand it, is that the respondent, once having undertaken to draft the document, let his professional judgment be affected by his relationship with McAuliffe, and prejudiced and damaged Fann by failing to adequately investigate the investment, obtain better security for it, or dissuade Fann from making the investment altogether.

In response to these charges, the respondent makes a series of factual and/or legal assertions: (1) that Julia Fann was no longer his client at the time when the document was drafted, (2) that the drafting of the document was merely a ministerial act performed at the request of W. Jason Mitan which did not require an exercise of his independent professional judgment, (3) that his professional judgment was not in any case affected by a per-

sonal interest because he adequately drafted the document to protect Julia Fann's investment, (4) that he did not advise Fann to invest in the Chambers Stamp Company, and (5) that his relationship with McAuliffe and McAuliffe's involvement in the Chambers Stamp Company were both so tenuous that they could not have affected his professional judgment. All of these assertions are incorrect.

The assertion that Julia Fann was no longer his client, an assertion which formed the main underpinning of the Review Board's decision, is not supported by the record. While Fann's personal injury suit had been settled on May 16, 1977, the respondent was still disbursing the settlement proceeds to her as late as June 29. Moreover, respondent continued until sometime in 1980 to represent Fann's minor son, Scotty, in a personal injury case. More importantly, the respondent met with Fann, probably during July or August of 1977, and urged her to sign the investment agreement. A letter respondent wrote to Fann on August 8 strongly suggests an on-going attorney-client relationship. Under the heading "Dear Julia" the respondent wrote:

> "I am typing this short note to you myself as everyone has left the office. I will look into those matters that you talked to me about on the telephone. I am enclosing a copy of the agreement and note relating to the investment with the Bob Weisz Stamp Company. I will be in touch with you right after I finish the present trial that I am engaged in."

If, in fact, the respondent believed that Fann was no longer his client and that he was drafting the investment agreement as an "accommodation" for Mitan, McAuliffe, Blair, or the Chambers Stamp Company, he should have clearly explained his position to Fann.

Second, we cannot agree that the drafting of the document was merely a ministerial act which did not call for

the exercise of the respondent's professional judgment. It is true that the investment agreement memorialized Fann's prior investment in the Chambers Stamp Company, which had been effectuated by her signature on a check made out to David Blair. However, the original agreement on the back of the check provided neither for a repayment date nor for any security. Particularly given Fann's precarious emotional condition (see *In re Crane* (1983), 96 Ill. 2d 40, 57), as well as the inherent riskiness of an investment in a small, close corporation, the respondent's drafting of provisions for security in the formal investment agreement was crucial.

It became particularly crucial after W. Jason Mitan's guarantee of the investment was stricken from the first draft of the agreement. In fact the respondent's later claim that he substituted his own oral guarantee of the loan for Mitan's written guarantee is a kind of tacit admission that the wording of the document mattered a great deal.

Third, respondent's claim that he in fact competently drafted the agreement is mistaken, on two different grounds. In the first place, Rule 5—101(a) does not require a showing that the respondent's professional judgment was *actually* compromised by a conflict of interest. The rule applies so long as the attorney's professional judgment "will be or *reasonably may* be affected" (emphasis added) (107 Ill. 2d R. 5—101(a)), by his personal interests. Assuming that the respondent's judgment might reasonably have been affected by his personal relationship with McAuliffe, his competent execution of the document would not protect him from discipline. By accepting employment and failing to disclose the relationship to Fann or obtain her consent, he violated Rule 5—101(a).

In the second place, we do not agree that the respondent did in fact adequately draft the document to

protect Fann's interests. The only collateral provided in the agreement was "various," and otherwise unspecified, stamps owned by Chambers Stamp Company, said to be worth $100,000, and an assignment of 50% of the stock of Bob Weisz Stamps, Inc., owned by David Blair. Without some provision insuring the stamps against loss, this portion of the security was inherently uncertain. As for the stock, the value of shares owned in a small, close corporation depends heavily on the assets and probity of the owner-managers of such a corporation. All of the shares of Bob Weisz Stamps, Inc., were owned by David Blair and Robert Weisz, and there was no certainty that the shares would be marketable to third parties in the event of a default on the loan.

Moreover, the respondent, having undertaken to represent Fann in these circumstances, made no investigation of either Bob Weisz Stamps, Inc., or Chambers Stamp Company to insure that the investment was sound. According to his own testimony, he relied solely on the advice of Robert McAuliffe, who, he believed, was "in the [stamp] business." The respondent's reliance on McAuliffe's expertise is somewhat strange, since McAuliffe was supposedly only an "amateur." Moreover, to the extent that McAuliffe had actual knowledge of the affairs of David Blair, Chambers Stamp Company, or Bob Weisz Stamp, Inc., it could only have been because he was personally involved in, had an interest in, or was engaged in managing or directing these companies. Such an interest was evidence that the respondent's own links to McAuliffe might reasonably affect the respondent's professional judgment. Given the riskiness of the investment and Fann's psychic vulnerability, the respondent had an obligation to either make a more thorough investigation, obtain better security, or substitute his own guarantee for Mitan's. He did none of these.

Fourth, the respondent argues that, since Fann had already "invested" in Chambers Stamp Company, and he did not counsel her to invest, his actions could not have caused Fann any harm. This contention must also fail, for the reasons given above. The original agreement, typed on the back of the check, did not provide any time for repayment of the loan, but only that it be "returned as agreed by the parties." Even after the check had been drawn, essential terms of the agreement had yet to be worked out. Fann might well have decided not to go ahead with it. The fact that she did not sign the draft agreement until November, long after the check had been drawn, would seem to indicate that she had doubts. The record is clear that the respondent assured her she was making a good investment and urged her to sign the draft agreement.

This same reasoning compels the conclusion that by failing to adequately counsel Fann about the investment, adequately investigate it, and/or adequately draft the security provisions of the agreement, the respondent intentionally prejudiced and damaged Fann's interests in violation of Rule 7—103(a).

Finally, the respondent argues that his own links with McAuliffe and McAuliffe's links with Chambers Stamp Company were too tenuous to constitute a personal interest which might reasonably affect his professional judgment. We do not agree. Whether or not McAuliffe possessed formal ownership of Chambers Stamp Company, the evidence clearly demonstrates that he managed and directed its affairs. He founded the company, and its name was a "poetic" reference to his own judicial "chambers." The course of the negotiation over Chambers' buy out of Bob Weisz Stamp, Inc., demonstrates that McAuliffe, rather than David Blair, made the crucial decisions regarding the transaction. He even went so far as to hold negotiating sessions in his chambers. The rec-

ord is also clear that the respondent and McAuliffe were close friends for many years. In addition, the respondent frequently practiced before Judge McAuliffe in the law division of the circuit court of Cook County.

It is also charged in count I that the respondent violated Rule 5—104 of the Code. Rule 5—104 provides that a "lawyer shall not enter into a business transaction with a client if they have conflicting interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." (107 Ill. 2d R. 5—104(a).) As to this count, the Administrator charges that the respondent involved himself in a conflict of interest by twice lending money to David Blair and the Chambers Stamp Company without informing Julia Fann of this fact, and without obtaining her consent.

The respondent lent money twice to the Chambers Stamp Company. The record is clear that the first loan, of $25,000 for 30 days so that Chambers might purchase some stamps, was not communicated to Julia Fann; nor did the respondent obtain her consent. We agree with the Administrator that his loan involved the respondent in a substantial conflict of interest, in violation of Rule 5—104. Had Chambers become involved in financial difficulties during the 30-day period, the respondent's interest as a creditor of Chambers could have conflicted with his position as Fann's attorney. The second loan, an "accommodation" of $60,000 to Blair so that he might purchase the remaining 50% of Bob Weisz Stamps, Inc., was communicated to Fann, but only after the fact. There is no evidence that Fann actually consented to the loan. Again, we find that this loan, half of which is still outstanding, involved the respondent in a conflict of interest violative of Rule 5—104 and constituted a breach of his fiduciary duty to his client.

We therefore find that the respondent was proved guilty by clear and convincing evidence of the conduct charged in count I of the complaint.

In the second count, it is alleged that the respondent used funds from Fann's settlement account to pay his gambling debt at the MGM Grand Hotel. The Administrator contends that this conduct violates Rule 7—101(a)(3) of the our rules by intentionally prejudicing or damaging Julia Fann. The respondent contends that W. Jason Mitan used the settlement account funds to pay the debt without the respondent's knowledge or acquiescence, and that in any case Fann eventually received this portion of the settlement proceeds.

The respondent's second point is not well taken. The mere fact that Fann eventually received some of the settlement proceeds, in whatever form, does not mean that she did not suffer damage or prejudice under Rule 7—101(a)(3). The use of settlement funds to pay attorney fees without prior notice to the client is forbidden by Rule 9—102(b) (107 Ill. 2d R. 9—102(b)). As we noted in *In re Enstrom* (1984), 104 Ill. 2d 410, 417, the proscription against commingling is intended not only to guard against actual loss of funds but also against the risk of loss. Similarly, Fann risked losing her portion of the settlement proceeds, thus suffering actual damage, the moment her check was used to pay the respondent's debt. In the event of the death of her attorneys or the dissolution of the firm prior to her receipt of the funds, she would have been hard-pressed to track down and secure all that she was rightfully due. Thus she suffered "prejudice" to her interests within the meaning of Rule 7—101(a)(3).

However, we agree with the respondent that the Administrator has failed to prove by clear and convincing evidence that the respondent, rather than Mitan, intentionally caused Fann to suffer prejudice to her interests.

While the respondent admitted that he was aware of the debt and Mitan's payment of it, he testified that he was unaware that Mitan had paid the debt with a check drawn upon Fann's account. Since the check did not clear through his own account, he would have had no way of knowing that Mitan had used Fann's funds to pay the debt.

The Hearing Board concluded that the respondent's account was not credible, based upon the .fact that he had only one Las Vegas gambling debt at the time. From this fact the Board inferred that the respondent could not have been unaware of how Mitan paid the debt. We do not believe that this conclusion is supported by clear and convincing evidence. Knowing that Mitan had paid the debt did not necessarily involve knowing how Mitan paid it, particularly since the check would not clear the respondent's account. The second count of the complaint is therefore dismissed.

In the third count of the complaint, the Administrator charges that the respondent intentionally mislead the Commission by giving false statements when answering questions at the Commission's office in response to a subpoena *duces tecum*. It is charged that the respondent, by this conduct, violated Rule 1—102(a)(4), which states that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." (107 Ill. 2d R. 1—102(a)(4).) The Hearing Board and Review Board both found that this charge was not proved by clear and convincing evidence. We agree.

At this deposition, the respondent was first asked a long series of questions relating exclusively to Fann, the Fann loan, and matters connected with it, all of which took place between May and September of 1977. These questions, and the respondent's answers to them, cover the first 48½ pages of the deposition transcript. After answering these questions, the respondent testified, in

response to questioning, that he never met with David Blair regarding Julia Fann's investment, that he had only met David Blair "personally" on one occasion, and that he never had any "dealings" with Blair. The Administrator contends that these responses were untruthful, since the record shows he had a number of telephonic contacts with David Blair in 1978 and 1979 pertaining to Julia Fann's investment. However, the Hearing Board found, and we agree, that respondent's answers to these questions pertained to the period between May and September of 1977 and to matters directly connected with Julia Fann during that period. This was the context of all of the preceding questions. We therefore hold that the Administrator has not proved this count by clear and convincing evidence and it is therefore dismissed.

It only remains to determine the appropriate sanction. The purpose of attorney disciplinary proceedings is to safeguard the public and maintain the integrity of the legal profession. (*In re Levin* (1979), 77 Ill. 2d 205, 211.) While a degree of uniformity in the application of attorney discipline is desirable (*In re Andros* (1976), 64 Ill. 2d 419, 425-26), each case presents a unique factual situation and must therefore be carefully evaluated on its own merits (*In re Hopper* (1981), 85 Ill. 2d 318, 324).

The factual situation of this case is, indeed, unique, and the record is replete with both aggravating and mitigating circumstances. On the one hand, the respondent achieved no benefit from his conduct. He was not paid any additional fees for his legal services with regard to the investment. He did not intentionally defraud his client. He has no prior history of disciplinary action.

In addition, the respondent himself lays heavy emphasis on his return of his fee to Julia Fann as "restitution" for the loss of her investment. This payment, however, is highly ambiguous. It came only after the investigation of the respondent had begun, and after Julia Fann had

made an exculpatory statement to the respondent's investigator. Moreover, if, as respondent himself claims, he orally "guaranteed" the investment, he should have given Fann the total outstanding principal, and not merely a sum equal to his fee in her personal injury case.

In aggravation, the Administrator cites uncharged conduct of the respondent which came to light in the course of the investigation. For example, the respondent's division of fees with W. Jason Mitan would appear to violate Rule 2—107 of the Code of Professional Responsibility. (See 107 Ill. 2d R. 2—107.) Moreover, the respondent's loan of $60,000 to a company controlled by Judge McAuliffe, then a sitting judge, may well be, though not charged, a violation of the canons of professional conduct.

It cannot be said that the respondent's negligent drafting and counseling were the sole causes of Julia Fann's loss. But even had Fann lost nothing, his actions helped to put her at considerable pecuniary risk. As the court has previously stated: "Where an attorney exposes a client to the risk of loss, jeopardizes the freedom or the pecuniary or privacy interests of a client, or otherwise abuses his or her relationship with a client, whether or not the attorney receives an intended advantage, the attorney has breached a duty, owed to a client, of safeguarding the public." *In re Saladino* (1978), 71 Ill. 2d 263, 276.

It is the order of the court that respondent be suspended from the practice of law for a period of two years and until the further order of this court.

In the event respondent, after consultation with the Attorney Registration and Disciplinary Commission, presents satisfactory proof to this court within 60 days from the date of this opinion that respondent has within that time paid to Julia Fann the amount lost by her as a

result of respondent's misconduct, together with interest thereon to the date of such payment, respondent's suspension from the practice of law shall be for a period of two years.

*Respondent suspended.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.